# LOS ANGELES FARMING AND MILLING COMPANY *v.* CITY OF LOS ANGELES.

ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.

No. 137.   Argued March 10, 11, 1910.—Decided April 4, 1910.

In this case both parties claim under Spanish or Mexican titles, confirmed by proceedings under the act of March 3, 1851, c. 41, 9 Stat. 631. The Federal rights alleged by plaintiff in error to have been violated by the decision of the state court, so far as concerns this act, relate to the extent of the right and ownership of the parties in the use of the Los Angeles River. Plaintiff in error contended that by its grant it became the owner of riparian rights without limitations by any right of the city of Los Angeles to use the water of the river, and that the city by failing to present its claim for the use of such water to the commission under the act of 1851 is foreclosed from now asserting them. The state court held that the city of Los Angeles had the exclusive right to the water of the Los Angeles

.River from its source to the most southern part of the city.   In
dismissing a writ of error to review the judgment of the state court
*held* that:                        .

The act of 1851 was a confirmatory act and not one granting titles;
that by its terms it did not originate titles nor make the patents to
be issued in pursuance of decisions of the commission conclusive
except upon the United States.                    .

The extent of riparian rights belonging to pueblos or persons receiv-
ing patents of the United States in pursuance of the decisions of
the commission under the act of March 3, 1851, are matters of local
or general law.

The decision of the state court in this case was put upon the effect of
the old Spanish or Mexican law as to the rights of the original
pueblo of Los Angeles succeeded to by the present city and such
rights were merely confirmed and not originated by proceedings
under acts of Congress; and therefore, as no rights existing under
an authority of the United States were denied, this court has no
jurisdiction to review the judgment under § 709, Rev. Stat.

Writ of error to review 152 California, 645, dismissed.

THE facts, which involve the title of the city of Los Angeles
to the waters of the Los Angeles River and to the use thereof,
are stated in the opinion.

*Mr. R. M. Widney* for plaintiff in error.

*Mr. W. B. Mathews* and *Mr. John F. Dillon,* with whom
*Mr. Leslie R. Hewitt* and *Mr. John C. Thomson* were on the
brief, for defendant in error.

MR. JUSTICE DAY delivered the opinion of the court.

The city of Los Angeles brought suit in the Superior Court
of the county of Los Angeles against the Los Angeles Farming
and Milling Company, hereinafter called the Milling Com-
pany, to quiet the title of the city to the use of the waters of
the Los Angeles River.   The city of Los Angeles is situated
on the Los Angeles River, a non-navigable stream rising in
the San Fernando Valley and mountains adjacent, and flow-

ing from the north down to and through said city. The Milling Company is the owner of a large tract of land, about 10,000 acres, situated some ten miles up stream above said city on the same river. In its complaint the city of Los Angeles sets forth that it is the owner of the paramount right to take and use all of the water of said river from its sources to the southern boundary of the city, so far as it is necessary to furnish a supply for the use of the city and its inhabitants; that the plaintiff in error owns its lands subject to such paramount right of the city to the use of the water, and claims adversely to the city and its estate and interest in said water right.

The defendant answered, and, among other things, set up a denial of the alleged paramount rights of the city in the waters of the Los Angeles River, and alleged that it and its predecessors had been in the exclusive possession of said lands for more than fifty years under claim of title, using the waters of the river riparian or appurtenant to its estate; that the value of the premises was over $500,000; that its lands were some ten miles above the city, on the river; that the title to the lands and waters in controversy were first owned by the crown of Spain, thence passing to the Republic of Mexico, which republic, on June 17, 1846, granted to the predecessors of the Milling Company certain lands, which included the lands in controversy; that by the treaty between the Republic of Mexico and the United States the sovereign rights and titles of said Republic of Mexico in said property passed to and vested in the United States; that California, upon its admission to the Union, was prohibited from passing any laws disposing of the public lands of the United States, or from doing any acts whereby the title of the United States in the public lands within its limits should be impaired or questioned; that the laws of the United States were extended over California, September 29, 1850; that the Congress of the United States passed an act, approved March 3, 1851, providing for the ascertainment and settlement of the land

claims derived from Spain or Mexico in the State of California, and created a board of land commissioners for that purpose; that all lands, the claim to which was rejected, or had not been presented, to said board should be held and considered as part of the public domain of the United States; that claims of towns or cities should be presented under said act; that a grant to cities or towns existing July 7, 1846, should be presumed; that the decrees and patents issued by the tribunals under said act should be conclusive between the United States and the claimant; that the claims of the predecessors in interest of the Milling Company to its lands was duly presented to the board of land commissioners, and confirmed on January 8, 1873, and the patent of the United States was issued to them, and, it is alleged, that said patentee thereby became vested with the rights in fee simple to said lands and all the waters therein or riparian thereto. It is alleged that this patent is *res judicata* of the rights of the Milling Company; that under the act of March 3, 1851, the mayor and council of the city of Los Angeles presented to the said board of land commissioners a claim for sixteen square leagues of land, known as the pueblo of Los Angeles, and for the water rights of the said Los Angeles River, for the use of the pueblo; that said claim was adjudged and affirmed to be valid to the extent of four square leagues, and held invalid as to the remainder thereof, and that a patent was issued by the United States to the city of Los Angeles on August 9, 1866, for four square leagues of land. The Milling Company sets up that this confirmation and patent in favor of the city is *res judicata* for four square leagues, and claims that the city is barred from setting up or claiming any title, ownership or interest in or to the premises in controversy herein; that the sources and tributaries of the Los Angeles River are located on the public lands of the United States; that the legislature of California has passed certain acts, attempting to confer and grant to the city of Los Angeles paramount right to take and use all the waters of the Los Angeles River, which acts, it is con-

tended, are null and void under the act of Congress admitting the State of California into the Union, and, under Article XIV of the Constitution, preventing private property being taken for public use without just compensation therefor. The answer also sets up the statute of limitations.

The case was submitted to the court of original jurisdiction upon a stipulation of facts, which shows that the pueblo of Los Angeles was established in 1781 under the government of Spain, containing four square leagues of land, embracing the lands afterwards patented to the city under the act of Congress of March 3, 1851; that the settlers and inhabitants of the pueblo used the water from the river by means of ditches for domestic and irrigation purposes until the time of the acquisition of the State of California by the United States, the amount of irrigable land being then about fifteen hundred acres, and it is stipulated:

"Under the laws of the Kingdom of Spain, said pueblo upon its foundation, by virtue of a grant under such laws, had the paramount right, claimed by the plaintiff in the complaint herein, to use all the water of the river, and such paramount right continued to exist under that government and under the Mexican government, until the acquisition of California by the United States."

It appears in the stipulation of facts that the pueblo of Los Angeles, in presenting its petition to the board of land commissioners, wherein it claimed the sixteen square leagues, presented as a part thereof a copy of an ordinance of the King of Spain, wherein he provides for the establishment of the town of Pitic in Sonora, and orders that the provisions relative thereto should be followed in the foundation of any new peublos in the jurisdiction of the commanding general of the internal provinces of the west, of which California constituted a part, and attached to that petition was a copy of the plan of the town of Pitic, which contained, among things this provision:

"7th. The neighbors and natives shall likewise enjoy the

use of the woods, water and other benefits from the royal and vacant lands lying outside of the tract assigned to the new town jointly with the residents and natives of the immediate and adjoining towns; which favor and right shall continue until by his majesty the same shall be granted or alienated; in which case regulations will be made according to the provisions for concessions in favor of new possessors or proprietors."

But there is nothing in the statement of facts affecting the force of the stipulation that the pueblo of Los Angeles had the paramount water right, as above stated and as claimed in the complaint, until the acquisition of the State of California by the United States. It is further stipulated that no grant nor claim of the real property described in the complaint was presented for confirmation under the act of March 3, 1851, except in so far as the same may have been embraced in the claim of the mayor and common council of the city of Los Angeles presented and confirmed in the manner described, which resulted in the confirmation and patent for four square leagues of land and the rejection of the claim for the remaining portion of the premises described and claimed by the petitioners; that pursuant to that decree the United States issued a patent for the four square leagues of land; that the city of Los Angeles was incorporated on April 4, 1850, by act of the legislature of California, with boundaries including the four square leagues, and the act provided that the city should succeed to all the rights, claims and powers of the pueblo of Los Angeles in regard to property, and should be subject to all the liabilities incurred and obligations created by the ayuntamiento of said pueblo. The decision of the commissioners was affirmed by the District Court of the United States and a patent was issued on August 9, 1866, in accordance therewith, for four square leagues. Afterwards, on August 12, 1875, another patent was issued by the United States for the four square leagues of land, in which latter patent no mention was made of the fact that the land

for which confirmation was asked contained sixteen square leagues, or that the claim of the city was founded on the Mexican grant to the petitioners made on August 25, 1844, as was stated in the earlier patent. The patent of August 4, 1875, contained a certificate of the United States surveyor general for California, that notice of the plat and survey had been advertised in two newspapers, and that the plat was a correct copy of the original and had been approved August 4, 1875, by the Commissioner of the General Land Office.

As to the land claimed and owned by the Milling Company, it is stipulated that it was contained in the Rancho Ex-Mission de San Fernando, which embraced the lands of the Milling Company, and was an imperfect or inchoate grant made by the Mexican Government on June 14, 1846, and the claim thereto of the predecessors in interest to the Milling Company was presented to and confirmed by the board of land commissioners under the act of March 3, 1851, and the patent of the United States was issued therefor on January 8, 1873; that said patent includes 121,619 acres of land, through a part of which the Los Angeles River and its tributaries flow; that said rancho is riparian to said river, and that the patent states that the United States of America granted the land therein embraced, with the appurtenances, without making any reservation or exception of any rights to said river, its tributaries or waters therein; that the value of the premises in controversy is over $400,000; that neither the city nor any of its predecessors have contested the grant, survey or proceedings in connection with the confirmation of the claim of the predecessors in interest to the Milling Company to said rancho; that said rancho is situated on said river, some ten miles above the city of Los Angeles, and above any of the points of diversion of water by said city; that after the acquisition of California by the United States, the pueblo of Los Angeles continued to exist and be managed by the pueblo authorities, and the water of said river continued to be used for domestic and irrigation purposes by its inhabitants until

the incorporation of the city under the legislative act of
April 4, 1850, and thereafter the use of water from said river
for municipal, domestic and irrigation purposes continued
until about 1901, since which time all of said water has been
needed and used for domestic purposes in said city as en-
larged from the patented area of 17,172 acres to 27,695 acres
in 1898; that the surface stream of the river continues for a
distance of several miles above the city, to points where it
rises from beneath the surface of the ground, and, in seasons
of heavy rainfall, it extends up to the mouths of the various
canyons, from which surface streams, coming from public
lands of the United States, and which are the sources and
tributaries of the Los Angeles River, emerge and flow, until
the approach of summer, when they sink into the sand at or
near the mouths of such canyons; that all of the territory in
which the surface stream of the Los Angeles River constantly
flows, and all of the valleys through which the torrential
surface stream of the river flows, in winter and spring, up to
the mouths of said canyons, are embraced within Spanish and
Mexican grants, confirmed and patented to parties, other
than the city, under the act of March 3, 1851; that the city
has sold to private parties all the lands embraced in its
patent from the United States, including the lands riparian
to the river, excepting certain lots, on which are erected public
city buildings, also certain parks and the river bed, 200 feet
more or less in width, inside the patent boundary; that the
allegations of the complaint, describing the Los Angeles
River, and showing that the underground stream thereof
extends throughout the whole of the lands of the Milling
Company, described in the complaint, are true.

Upon submission to the trial court a judgment was ren-
dered in favor of the city, ordering and adjudging that the
city was the owner in fee simple of the paramount right to
take and use the water of the Los Angeles River from its
source to the southern boundary of the city of Los Angeles,
so far as may be reasonably necessary, from time to time, to

give an ample supply of water for the use of its inhabitants, and for all the municipal purposes and uses of the city, and the city was quieted in its title and right to the use of the water as aforesaid.

Upon appeal to the Supreme Court of California the judgment of the lower court was affirmed (152 California, 645), and the case is brought here by writ of error to that court.

A case can only be brought to this court from a supreme court of a State by writ of error under § 709 of the Revised Statutes of the United States, in order to determine Federal rights asserted under that section of the statutes which it is claimed have been denied by the decision and judgment of the supreme court of the State. It is therefore necessary to know just what is comprehended in the decision and judgment of that court. The Supreme Court of California, after reciting the proceedings and facts found in the court below, dealt with the contention of the plaintiff in error as to the proceedings under the act of March 3, 1851, which confirmed the title to the lands described, and held that in confirming the title to the lands and awarding patents therefor the riparian rights of the proprietors and patentees were left to be determined by the law of the country or State where the land is situated, and denied the contention of the Milling Company that the city had only title to the four square leagues of land awarded to it by the proceedings and patents under the act of March 3, 1851, with no ownership in the use of the water above the limits of the land granted, and denied the further contention that by the proceedings and patent to the Milling Company's predecessors they were adjudged the riparian owners with the use of the waters of the river running through the land as part and parcel of their estate. The court having reached this conclusion as to the effect of the act of March 3, 1851, held that the only question in the case was as to whether under the Spanish and Mexican law the old pueblo of Los Angeles and the city as its successor had,

as against the Milling Company, the prior and paramount ownership of so much of the water of the Los Angeles River as is necessary for its inhabitants, and for general municipal purposes, and held that this question was answered in the affirmative in the prior decisions of the California Supreme Court. *Lux* v. *Haggin,* 69 California, 265; *Vernon Company* v. *Los Angeles,* 106 California, 237; *Los Angeles* v. *Pomeroy,* 124 California, 597 (same case in this court, *sub. nom. Los Angeles* v. *Hooker,* 188 U. S. 314).

These decisions the court held to be determinative of the prior and paramount right of the pueblo and its successor under rights existing under the Spanish and Mexican laws, confirmed by the United States to the successors of the pueblo. The court declined to consider for what municipal purposes the water could be used as against a riparian owner, and held that the extent of the city's prior and paramount right was not involved in the case.

It is thus apparent that the Supreme Court of California put the decision of the case upon the effect of the old Spanish or Mexican law as to the rights of the pueblo succeeded to by the city, and confirmed by proceedings under the acts of Congress for the purpose of confirming such titles.

We come then to consider what Federal questions are really presented in this record, and whether, in reaching the decision which we have stated the Supreme Court of California directly, or necessarily, by reason of its decision, denied such rights asserted under § 709 of the Revised Statutes. We may at once put aside, as not presenting Federal questions of serious import, the assignments of error to the effect that the decision of the Supreme Court of California denied to the plaintiff in error due process of law or the equal protection of the laws secured by the Fourteenth Amendment of the Constitution of the United States. We may treat in like manner the assignments involving the construction by the Supreme Court of the state statutes, and rulings as to the admissibility of evidence. Nor do we find any denial of Federal right worthy

of consideration in the assertion that the statutes of California have undertaken to confer the water rights in controversy on the city of Los Angeles, and were given such effect, in violation of the Federal rights of the plaintiff in error. As we have seen, the rights of the city were not determined by the effect. of those statutes, but upon the right and title secured by the Spanish or Mexican law, and the subsequent confirmation thereof under the statute of the United States.

As to the assignment of error that the effect of the judgment is to interfere with the disposition of the public lands by the United States.

The act of March 3, 1851 (chap. 41, 9 Stat. 631, 634, § 14), made provision for the presentation to the commission of the former right of pueblos and the issue of patents to them upon confirmation. And further, the same section provided that the existence of a city, town or village on July 7, 1846, being duly proved, should be *prima facie* evidence of a grant to such corporation.

This court, speaking by Mr. Justice Miller, tersely disposes of the nature of such old Mexican titles in *Adam* v. *Norris,* 103 U. S. 591, 593:

"But the United States in dealing with parties claiming under Mexican grants, lands within the territory ceded by the treaty of Mexico, never made pretense that it was the owner of them. When, therefore, guided by the action of the tribunals established to pass upon the validity of these alleged grants, the Government issued a patent it was in the nature of a quitclaim—an admission that the rightful ownership had never been in the United States, but had passed at the time of the cession to the claimant, or to those under whom he claimed. This principle has been more than once clearly announced in this court. The leading cases are *Beard* v. *Federy,* 3 Wall. 478; *Henshaw* v. *Bissel,* 18 Wall. 255; *Miller* v. *Dale,* 92 U. S. 473."

It is perhaps more accurate to say that the action of the United States in such cases is a confirmation rather than a

quitclaim.   *Boquillas Land & Cattle Co.* v. *Curtis*, 213 U. S.
339, 344.

The assignments covering other Federal questions which
should be noticed embrace the contention that the rights of
the Milling Company were secured under the treaty of Guada-
lupe Hidalgo between the United States and Spain, and under
the act of Congress of March 3, 1851, for the confirmation of
titles derived from the Spanish or Mexican governments.
The contentions as to the supposed rights derived under that
treaty and act have been before this court in a number of
cases, in which it has been uniformly held that rights alleged
to have arisen thereunder, in the manner claimed by the
present plaintiff in error, are not rights of Federal origin
which, when denied, lay the basis for the review and reversal
of the judgment of the state court.

In *Townsend* v. *Greeley*, 5 Wall. 326, Mr. Justice Field,
delivering the opinion of the court, held that the treaty of
Guadalupe Hidalgo does not purport to divest the pueblo,
existing at the site of the city of San Francisco, of any rights
of property or to alter the character of interests it may have
held in any lands under the former government; that the
treaty provided for the protection of the inhabitants in their
property, and that the same rights exist as to towns under
the Mexican Government, and dealing with both the treaty
and the act of Congress of March 3, 1851, Mr. Justice Field,
again speaking for the court in *Beard* v. *Federy*, 3 Wall. 478,
491, etc., said:

"In the first place, the patent is a deed of the United States.
As a deed its operation is that of a quitclaim, or rather a con-
veyance of such interest as the United States possessed in the
land, and it takes effect by relation at the time when proceed-
ings were instituted by the filing of the petition before the
board of land commissioners.

"In the second place, the patent is a record of the action of
the government upon the title of the claimant as it existed
upon the acquisition of the country.   Such acquisition did

not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law of nations to protection in them to the same extent as under the former government. The treaty of cession also stipulated for such protection. The obligation, to which the United States thus succeeded was, of course, political in its character, and to be discharged in such manner, and on such terms, as they might judge expedient. By the act of March 3, 1851, they have declared the manner and the terms on which they will discharge this obligation. They have there established a special tribunal, before which all claims to land are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the District and then to the Supreme Court; and designated officers to survey and measure off the land when the validity of the claims is finally determined. When informed, by the action of its tribunal, and officers, that a claim asserted is valid and entitled to recognition, the government acts, and issues its patent to the claimant. This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises as they are surveyed and described."

In the later case of *Los Angeles* v. *Hooker*, 188 U. S. 314, practically the same contentions were made as in the case at bar concerning the effect of the act of 1851 and the treaty of Guadalupe Hidalgo. In that case the lands of the plaintiff in error were situated above the city of Los Angeles, and it was sought to appropriate them to the use of the city for the purpose of maintaining thereon the headworks of a system of water supply. In that case, as here, the city contended

that the rights of the plaintiffs in error were subject to the paramount rights of the city of Los Angeles to take water for the use of its inhabitants, for all the public and municipal purposes of the city. Plaintiffs in error denied this contention and set up their own rights as riparian owners of the lands, the confirmation of their rights by the board of land commissioners under the act of Congress of 1851, confirmed by the District Court for the Southern District of California, and patents duly issued in accordance therewith. The contention of the plaintiff in error was that the state court decided against its rights as riparian owners, and as to the ownership of the percolating waters described from patents of the United States as well as from Mexican grants, and under the treaty of Guadalupe Hidalgo. Delivering the opinion of the court, Mr. Chief Justice Fuller said:

"Obviously, the question as to the title or right of plaintiffs in error in the land, and whatever appertained thereto, was one of state law and general public law, on which the decision of the state court was final. *San Francisco* v. *Scott,* 111 U. S. 768; *Powder Works* v. *Davis,* 151 U. S. 389. And the question of the existence of percolating water was merely a question of fact.

"The patents were in the nature of a quitclaim, and under the act of March 3, 1851, were 'conclusive between the United States and the said claimants only, and shall not affect the interest of third persons.' The validity of that act was not drawn in question in the state court, and as the right or title asserted by plaintiffs in error was derived under Mexican and Spanish grants, the decision of the state court on the claims asserted by plaintiffs in error to the waters of the river was not against any title or right claimed under the Constitution, or any treaty, or statute of, or commission held, or authority exercised under, the Constitution. If the title of plaintiffs in error were protected by the treaty, still the suit did not arise thereunder, because the controversy in the state court did not involve the construction of the treaty, but the validity of the

title of Mexican and Spanish grants prior to the treaty. *New Orleans* v. *De Armas*, 9 Pet. 224; *Iowa* v. *Rood*, 187 U. S. 87; *Phillips* v. *Mound City Association*, 124 U. S. 605."

In *Powder Works* v. *Davis*, 151 U. S. 389, referred to by the Chief Justice in *Los Angeles* v. *Hooker*, it was held, referring to the previous case of *Phillips* v. *Mound City Assn.*, 124 U. S. 605, that the treaty of Guadalupe Hidalgo protected all existing property rights, but neither created nor defined the rights, and that a confirmation of such rights by a decree of the court did not determine rights which depended upon the Constitution, laws or treaties of the United States.

Similar questions came before this court in *Devine* v. *Los Angeles*, 202 U. S. 313. In that case 244 complainants, owners of lands situated in the county of Los Angeles and in the Ranchos San Rafel, Los Felis and Providencia, and whose title was alleged to have been confirmed pursuant to the treaty of Guadalupe Hidalgo by the board of land commissioners created under the act of Congress of 1851, and to whom patents had been issued by the United States, brought suit against the city of Los Angeles to quiet their title as against the claims of the city of Los Angeles to the paramount use of the water of the Los Angeles River. The bill is abstracted at length in the report of that case and it was alleged there, as here, that the rights asserted by the city and acts of the legislature and charters of the city were in violation of the Fourteenth Amendment of the Constitution, and that the city of Los Angeles should have presented its claims to the waters of the river to the board of land commissioners under the act of Congress of March 3, 1851, and that a decree should be granted declaring the acts of the legislature of California and the charters of the city of Los Angeles invalid in respect to conferring upon the city any rights in the waters of the Los Angeles River other than those which were ascertained and confirmed under the act of March 3, 1851.

An answer was filed by the city, fully setting up its rights and contentions, as the successor of the pueblo to the owner-

ship of the waters in the river and its tributaries, and admitting that it rested its claim to the Los Angeles River and the waters thereof, including the waters in the lands of the complainants, upon the treaty of Guadalupe Hidalgo, which protected the rights of pueblos as well as the rights of individuals, and in part upon the act of Congress of March 3, 1851, confirming the claims of pueblos and municipal corporations to lands granted by Spain and Mexico, and that the confirmation thereof had the effect of confirming the water rights contended for by the city; that said act did not require claims for property otherwise than for land to be presented for confirmation. The answer sets out a detailed history of the pueblo and city of Los Angeles, and certain prior adjudications which were claimed to conclude the plaintiff in the suit.

After the pleadings were filed the city of Los Angeles moved the court to dismiss the case on the ground that there was no Federal jurisdiction thereof; the motion was sustained, and the case brought to this court upon a certificate. This court held that there was no jurisdiction of the case in the Federal court, quoting in the opinion from the previous cases to the effect that the rights of the complainant depended upon the Spanish and Mexican grants confirmed by the board of land commissioners, (*Los Angeles* v. *Hooker,* 188 U. S. *supra*), and again held that the extent of the riparian rights of the plaintiffs alleged to be derived from the patents of the United States and confirmed Mexican grants, did not present a right, title, privilege or immunity arising under statutes or treaties of the United States. The court also cited *Chrystal Springs Land & Water Co.* v. *Los Angeles,* 177 U. S. 169, in which this court affirmed the ruling of the Circuit Court of the United States for the Southern District of California, holding that a controversy between parties claiming under Mexican grants, alleged to be confirmed and patented by the United States in accordance with the treaty of Guadalupe Hidalgo, was only a controversy as to what rights were thus granted and confirmed, and could not lay the basis for a suit as one arising un-

der the laws and treaties of the United States, and the decree of the Circuit Court dismissing the bill for want of jurisdiction was affirmed.

It is insisted that the Supreme Court of California, in holding that the term "land," as embraced in the act of March 3, 1851, did not include the riparian rights of the patentee of the land nor conclude the city from making claim of ownership of the water rights in controversy, and leaving to local law the determination of what riparian rights are embraced in the word "land," denied to the plaintiff in error the rights which had accrued to it because of the proceedings under the act of 1851 and the benefits of the limitations upon the rights conferred upon the city of Los Angeles by reason of the proceedings and determination of the commissioners. But as these alleged rights and limitations arise under the act of March 3, 1851, which this court has repeatedly held did not originate Federal rights or titles, but merely confirmed the old ones, we cannot review the judgment of the state court in this respect. In its opinion in the case at bar the Supreme Court of California said that in this respect it was following *Hardin* v. *Jordan*, 140 U. S. 371, and this court has frequently held that the extent of the right and title of a riparian owner under a patent is one of local law. See recent decision of *Whitaker* v. *McBride*, 197 U. S. 510, and cases therein cited.

And whatever the rule may be as to patents conveying title to the lands of the United States, it has been distinctly held in this court that neither the treaty of Guadalupe Hidalgo nor patents under the act of March 3, 1851, are original sources of private titles, but are merely confirmatory of rights already accrued under a former sovereignty.

Both parties claim under Spanish or Mexican titles, confirmed by proceedings under the act of March 3, 1851. The Federal rights alleged by the plaintiff in error to have been violated by the decision and judgment of the Supreme Court of California, so far as concerns this act, relate to the extent of the right and ownership in the use of the waters of the Los

Angeles River by the one or the other of the parties to this suit. The plaintiff in error, as we have seen, contends that by its grant it became the owner of riparian rights in such waters without limitation by any supposed right in the city of Los Angeles to use the water of the river, and that the city of Los Angeles, by failing to present the claim it now makes for the use of the waters of the river to the commissioners under the act of 1851, and by the effect of the judgment of the commissioners upon the petition presented by the city is forever adjudicated to have no such water rights in the river as the city now contends for and as were awarded to it by the decision and judgment of the Supreme Court of California.

The defect of these contentions from the standpoint of Federal jurisdiction is that this court has already determined, in the cases above cited, that the act of 1851 was a confirmatory act; that by its terms it did not undertake to originate titles or make the patents to be issued in pursuance of the decisions of the commission conclusive except upon the United States; and that the extent of the riparian rights belonging to pueblos or persons receiving such patents are matters of local or general law.

In this view the writ of error must be dismissed for want of jurisdiction.