**Stanley HYMAN and Molly L. Hyman, and Beatrice Dilworth, Plaintiffs,**

v.

**STATE LANDS COMMISSION OF the STATE OF CALIFORNIA, Kenneth Cory, Mike Curb, and Mary Ann Graves, individually and as members of the California State Lands Commission, the City of Los Angeles, a municipal corporation, Defendants.**

**No. CV 81–5403 MRP.**

United States District Court, C. D. California.

April 23, 1982.

Richard H. Cooper, Freshman, Mulvaney, Marantz, Comsky, Kahan & Deutsch, Beverly Hills, Cal., for plaintiffs.

George Deukmejian, Atty. Gen., N. Gregory Taylor, Asst. Atty. Gen., Nancy Alvarado Saggese, Deputy Atty. Gen., Los Angeles, Cal., for defendants State Lands Comm'n, Kenneth Cory, Mike Curb and Mary Ann Graves.

Ira Reiner, City Atty., Norman L. Roberts, Asst. City Atty., Los. Angeles, Cal., for defendant City of Los Angeles.

MEMORANDUM OF DECISION

PFAELZER, District Judge.

Defendants' motions to dismiss for lack of federal jurisdiction came on for hearing on March 22, 1982 before the Honorable Mariana R. Pfaelzer. The Court, having considered the papers filed and oral arguments made, has concluded that the suit should be dismissed for lack of federal jurisdiction.

This suit involves the extent of plaintiffs' ownership rights in property located in Del Rey Lagoon, Playa Del Rey. Plaintiffs' Mexican predecessors in title were the Machado and Talamantes families who received title to the land from the Mexican government. When the United States conquered Mexico on July 1, 1846, the status of privately owned Mexican territory became an issue. To clarify the rights of the United States and the rights of private Mexican citizens to the conquered land, the United States signed the Treaty of Guadalupe Hi-

---

**4.** Since the motion is denied, it is unnecessary to address the Government's *Calandra* contentions.

dalgo (the "Treaty"). In the Treaty, the United States promised to respect and protect private Mexican property rights as it respects and protects private American property rights.

California entered the Union on September 9, 1850. Shortly thereafter, on March 3, 1851, Congress promulgated an Act to dispose of private land claims in California. The Act of March 3, 1851 (the "Act") established a Board of Land Commissioners to investigate private Mexican real property claims, "confirm" them, and issue a United States patent to the property owner. The Act provided that a claimant had the right to appeal the Board's determination in the federal courts. Plaintiffs' predecessors in title went through this process and received a United States patent.

Plaintiffs allege that defendants are claiming a public trust easement over all tideland areas, including their land, in Playa Del Rey. The bases of this claim of easement are Laws 3 and 6 of the Partidas, a reservation in the Machado Grant, several "unofficial" maps of the State Lands Commission, and a plat dated September 3, 1981. Plaintiffs allege that this claim has created a cloud on their title which is preventing them from selling their land. Defendants have denied, from the inception of this suit, that they are making any such claim to plaintiffs' land. However, for the sake of this discussion, the Court will assume that defendants' actions have created a cloud on plaintiffs' title.

Defendants' motion first seeks dismissal on the ground that no federal question is alleged on the face of plaintiffs' complaint. Defendants are correct that the general rule, as articulated in *Louisville & Nashville Railroad Co. v. Mottley*, 211 U.S. 149, 29 S.Ct. 42, 53 L.Ed. 126 (1908), is that a plaintiff may not invoke federal question jurisdiction by anticipating in his complaint a defense which the defendant will raise.

There is a sound exception to this rule, however, in the case of declaratory judgments. In an action for a declaratory judgment, the federal court will have federal question jurisdiction if a coercive action brought by the defendant based on the anticipated defensive matter would meet the test for federal question jurisdiction articulated in *Gully v. First National Bank in Meridian*, 299 U.S. 109, 57 S.Ct. 96, 81 L.Ed. 70 (1936).[1] *See, e.g., E. Edelmann & Co. v. Triple-A Specialty Co.*, 88 F.2d 852 (7th Cir. 1937), *cert. denied*, 300 U.S. 680, 57 S.Ct. 673, 81 L.Ed. 884 (1937). Therefore, if an essential part of defendants' defense of this suit raises a federal question, the Court will have subject matter jurisdiction.

Next, defendants' motion submits that federal law is not substantially involved in any aspect of this case. Defendants' claim is accurate. Three Supreme Court cases deal with facts very similar to those involved in this case and squarely conclude that no questions of federal law are involved in the resolution of this type of dispute. *Los Angeles Farming and Milling Co. v. City of Los Angeles*, 217 U.S. 217, 30 S.Ct. 452, 54 L.Ed. 736 (1910), *Devine v. Los Angeles*, 202 U.S. 313, 26 S.Ct. 652, 50 L.Ed. 1046 (1906), and *Hooker v. Los Angeles*, 188 U.S. 314, 23 S.Ct. 395, 47 L.Ed. 487 (1903).

In *L.A. Milling*, the City of Los Angeles brought suit to quiet title to the use of the Los Angeles river. Both the City and the Milling Company traced their titles to Spanish or Mexican grants confirmed by proceedings conducted under the Act of March 3, 1851. The Court addressed the issue of whether the invocation of the Treaty of Guadalupe Hidalgo, the Act of March 3, 1851, and a United States patent issued pursuant to the Act raised federal questions.[2] The Court concluded that their involvement in the case did not raise questions of federal law.

---

1. Gully requires that the federal question be an essential element of plaintiff's claim for relief supported under one construction of federal law and defeated under another. 299 U.S. at 112–13, 57 S.Ct. at 97, 81 L.Ed. at 72.

2. Much of plaintiffs' claim that this suit is grounded in federal law is based on the involvement of the Treaty, the Act, and a United States patent.

The Court first addressed the question of whether the involvement of a federal patent meant that a federal question was involved. Citing *Adam v. Norris*, 103 U.S. 591, 593, 26 L.Ed. 583, 584 (1881), the Court's view was that the issuance of a patent by the United States did not mean that the United States was passing title, granting, or conveying anything in any way by the patent.

> But the United States in dealing with parties claiming under Mexican grants, lands within the territory ceded by the treaty of Mexico, never made pretense that it was the owner of them. When ... the Government issued a patent it was in the nature of a quitclaim—an admission that the rightful ownership had never been in the United States ....

217 U.S. at 227, 30 S.Ct. at 456, 54 L.Ed. at 745.

Next, the Court quoted extensively from *Hooker v. Los Angeles*, 188 U.S. 314, 23 S.Ct. 395, 47 L.Ed. 487 (1903), to support its conclusion that the involvement of the Treaty of Guadalupe Hidalgo and the Act of March 3, 1851 did not raise federal questions. The facts in *Hooker* were almost identical to those in *L.A. Milling*. In *Hooker*, the City sued Hooker to condemn certain lands which the City wanted to use to construct and maintain headworks for its water supply system. Hooker responded by claiming that Spain and Mexico had granted the land to his predecessors in title. This conveyance was later confirmed by the Board of Land Commissioners which subsequently issued a patent. As owners of the land, therefore, defendants claimed to own the water which percolated through the soil.

The Court concluded that, "Obviously, the question as to the title or right of plaintiffs in error in the land, and whatever appertained thereto, was one of state law and of general public law ... [a]nd the question of the existence of percolating water was merely a question of fact." 188 U.S. at 317, 23 S.Ct. at 396, 47 L.Ed. at 490. After stating that the patents "were in the nature of a quit claim," the Court found that the

suit did not arise under the Treaty "because the controversy in the state court did not involve the construction of the treaty, but the validity of the title of Mexican and Spanish grants prior to the treaty." *Id.* at 317–18, 23 S.Ct. at 396–97, 47 L.Ed. at 490. *See also California Powder Works v. Davis*, 151 U.S. 389, 14 S.Ct. 350, 38 L.Ed. 206 (1894) (The Treaty of Guadalupe Hidalgo protected all existing property rights, but neither created nor defined the rights. A confirmation of such rights did not determine rights which depended on the Constitution, laws or treaties of the United States).

The involvement of the Act of March 3, 1851 did not raise a federal question either. The *L.A. Milling* Court stated that, "[A]s these alleged rights and limitations arise under the act of March 3, 1851, which this court has repeatedly held did not originate Federal rights or titles, but merely confirmed the old ones, we cannot review the judgment of the state court in this respect." 217 U.S. at 233, 30 S.Ct. at 459, 54 L.Ed. at 747.

Plaintiffs' response to these cases relies primarily on *Borax Consolidated, Ltd. v. Los Angeles*, 296 U.S. 10, 56 S.Ct. 23, 80 L.Ed. 9 (1935), as well as on *United States v. Oregon*, 295 U.S. 1, 55 S.Ct. 610, 79 L.Ed. 1267 (1935), *United States v. Utah*, 283 U.S. 64, 51 S.Ct. 438, 75 L.Ed. 844 (1931), and *Knight v. United States Land Association*, 142 U.S. 161, 12 S.Ct. 258, 35 L.Ed. 974 (1891). Plaintiffs claim that these cases lead to the conclusion that a question of federal law exists when a United States patent is involved. They claim that the existence of a patent puts in question "the validity and effect of an act done by the United States ... [which, therefore,] involves the ascertainment of the essential basis of a right asserted under federal law." 296 U.S. at 22, 56 S.Ct. 29, 80 L.Ed. at 17. None of plaintiffs' cases is controlling in the instant suit, however, because all four of them involved grants of land by the United States or lands which were once owned by

the United States.[3] It is undisputed that if plaintiffs' land once belonged to the United States and was subsequently granted by the United States, federal law would determine exactly what passed from the United States. But the instant case involves land which never belonged to the United States. Before Mexico was conquered, the disputed land was privately owned. After the conquest, the United States agreed to honor the ownership rights of private citizens under the Treaty of Guadalupe Hidalgo. *See Knight, supra*, n.3. Federal law, therefore, plays no role in the dispute before the Court. *See also Carpenter v. City of Santa Monica*, 63 Cal.App.2d 772, 147 P.2d 964 (1944).

Plaintiffs also claim that a case rests on federal law whenever the equal footing doctrine is involved. This claim is unfounded. Although the equal footing doctrine is based on the Constitution, its involvement in a dispute does not add a substantial federal question.

Under the equal footing doctrine, each state admitted into the Union after the first thirteen, enters on an equal footing with the original states. *See Pollard's Lessee v. Hagan*, 44 U.S. (3 How.) 212, 229, 11 L.Ed. 565, 573 (1845). The cases plaintiffs cite as concluding that the existence of the equal footing doctrine raises federal questions also involved specific grants by the United States.

Plaintiffs also cite *Bonelli Cattle Co. v. Arizona*, 414 U.S. 313, 94 S.Ct. 517, 38 L.Ed.2d 526 (1973) as standing for the proposition that the passage of title from the United States to a state upon the state's admittance to the Union is a "federal grant." The narrow holding in *Bonelli* has

been criticized from its inception and *Bonelli* was explicitly overruled in *Oregon v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 97 S.Ct. 582, 50 L.Ed.2d 550 (1977). Justice Rehnquist restated the Court's holding in *Bonelli* as "federal common law should govern in deciding whether a State retained title to lands which had reemerged from the bed of a navigable stream." 429 U.S. at 369, 97 S.Ct. at 586, 50 L.Ed.2d at 557–58. He later declared that, "Our analysis today leads us to conclude that our decision to apply federal common law in *Bonelli* was incorrect." *Id.* at 370, 97 S.Ct. at 587, 50 L.Ed.2d at 558. The Court found that once the state was admitted, title vested "absolutely" and was "not subject to later defeasance by operation of any doctrine of federal common law." *Id.* at 371, 97 S.Ct. at 587, 50 L.Ed. at 558. Although this criticism of *Bonelli* does not exactly address issues involved in the instant case, Justice Rehnquist's discussion continued and addressed theories which plaintiffs urge this Court to adopt.

> The only other basis for a colorable claim of federal right in *Bonelli* was that the Bonelli land had originally been patented to its predecessor by the United States, just as had most other land in the Western States. But that land had long been in private ownership and, hence, under the great weight of precedent from this Court, subject to the general body of state property law.

*Id.* at 371–72, 97 S.Ct. at 587–88, 50 L.Ed.2d at 559. Hence, Justice Rehnquist reaffirmed that neither the equal footing doctrine nor a patent from the United States on land which had long been in private ownership creates a federal question.[4]

---

**3.** In *Borax*, Los Angeles claimed the right to tidelands under a grant from the State and Borax claimed that the United States granted the same land to it. In *Oregon*, the Court found a nonnavigable lake was a part of the public domain of the United States when Oregon was admitted to the Union and did not pass to Oregon under the equal footing doctrine because it was not a navigable body of water. In *Utah*, the definition of "navigability" was found to be one of federal law because it determines what passes to the State under the equal

footing doctrine and what title remains in the United States. The *Knight* Court found that federal law applied to the lands which the United States acquired from Mexico but did not apply "to lands that had been previously granted to other parties by the former government." 142 U.S. at 183, 12 S.Ct. at 264, 35 L.Ed. at 982.

**4.** Another explanation why the equal footing doctrine does not give rise to a federal question is that the "grant" of land from the United States to a new state is not truly a "grant".

Supreme Court precedent, from 1900 to 1977, is controlling here. It is consistent in establishing the principle that no federal question is involved in determining rights to land held privately at the Mexican conquest and subsequently confirmed and patented by the United States.

For the reasons stated herein,

IT IS ORDERED that defendants' motion to dismiss for lack of subject matter jurisdiction is granted.

Instead, the United States had no choice, under the Constitution, but to "grant" the land to the state. The equal footing doctrine does not involve a federal grant and, therefore, does not involve federal law. See 50 Washington L.Rev. 777 (1975).