[L. A. No. 3056. In Bank.—December 20, 1913.]

THE PEOPLE, upon Information of U. S. WEBB, Attorney-General, Respondent, v. SOUTHERN PACIFIC RAILROAD COMPANY (a Corporation), SOUTHERN PACIFIC COMPANY (a Corporation), and HOMER S. KING et al., Defendants and Appellants, MARY H. BANNING et al., Defendants and Respondents.

TIDE LANDS—PATENT FOR LAND WITHIN TWO MILES OF TOWN OF WILMINGTON IS VOID—EFFECT OF PATENT AS TO LAND BEYOND SUCH LIMIT.—*People* v. *California Fish Company, ante,* p. 576, followed with respect to the construction and effect of sections 3440 et seq., of the Political Code, and the act of 1872 incorporating Wilmington.

ID.—ADVERSE POSSESSION—STATUTE OF LIMITATIONS—POSSESSION BY RAILROAD UNDER STATE AUTHORITY FOR WHARF AND RAILROAD PURPOSES.—The possession by a railroad company of such tide lands within the two mile-limit of the town of Wilmington, solely under a wharf franchise and permits for railroad purposes issued by the state authorities in pursuance to the provisions of section 478 of the Civil Code, was not adverse to the state, as to the fee, but was attributable solely to the right of possession by virtue of the franchise and permits. It did not set the statute of limitations in motion, and could not support a title by prescription to any subordinate estate in the land.

ID.—EFFECT OF ADVERSE POSSESSION OF TIDE LANDS SUBJECT TO SALE.—Under the principles stated in the opinion in *People* v. *California Fish Co., ante,* p. 576, all that could be gained by adverse possession or the statute of limitations, as to the tide lands situated beyond the two mile-limit, was the title to the soil, subject to the public easements for navigation and fishery.

ID.—APPEAL—OMISSION TO FIND MATERIAL FACT—APPELLATE COURT CANNOT SUPPLY OMITTED FINDING.—The supreme court cannot make findings of fact in a case before it, on appeal. If facts necessary to support the judgment are proven, but not found, the judgment must be reversed.

APPEAL from a judgment of the Superior Court of Los Angeles County and from an order refusing a new trial. Walter Bordwell, Judge.

The facts are stated in the opinion of the court.

Gibson, Dunn & Crutcher, J. W. McKinley, Frank Karr, Ward Chapman, Sheldon Borden, Edward E. Bacon, and W. R. Millar, for Appellants.

Chickering & Gregory, Goodfellow, Eells & Orrick, Donald Y. Campbell, J. W. Lilienthal, H. D. Newhouse, Heller, Powers & Ehrman, Thomas, Beedy & Lanagan, H. H. McCloskey, and McCutchen, Olney & Willard, *Amici Curiae*, in support of appeal.

U. S. Webb, Attorney-General, Leslie R. Hewitt, John W. Shenk, A. P. Fleming, and Anderson & Anderson, for Respondent.

SHAW, J.—The appeals are from the judgment and from an order denying a motion for a new trial.

This is one of the series of cases mentioned in the opinion in L. A. No. 3060, entitled the *People* v. *California Fish Co., ante,* p. 576, [138 Pac. 79.] The present case involves tide land location No. 69. The application and survey therefor were filed on December 23, 1878, payment was made on July 16, 1883, and the patent was issued on August 4, 1883, to William L. Banning. The land embraces a strip of tide land extending along the water-front of San Pedro occupied by the defendant railroad companies by its railroad tracks and wharves. All of this strip lying north of the prolongation of the center line of Fourth Street in San Pedro lies within two miles of the corporate limits of the town of Wilmington as incorporated by the act of 1872. The remainder thereof is beyond said limits. The law governing the case is the same as that stated in the aforesaid opinion in L. A. No. 3060, and we refer to that opinion for the discussion thereof. The land within the two-mile limit was withheld from sale at the time this patent was issued, and Banning obtained no title thereto by his patent. With respect to the land beyond those limits he obtained title to the soil as mentioned in said opinion, subject to the public easement for navigation and fishery.

The appellants claim certain rights under a wharf franchise and permits issued by the state authorities, respectively, on June 4, 1881, and April 7, 1887, the latter being issued under the provisions of section 478 of the Civil Code. Under

it the railroad company built a track and established wharves at San Pedro on the premises. Upon the trial it was stipulated that the rights of the appellants under these permits should not be considered or adjudicated, and the judgment accordingly saves them.

The defendants also claim title by prescription and set up the bar of the statute of limitations. With respect to all that part of the tract lying within two miles of Wilmington, there has been no possession by defendants, except under the wharf franchise and state permits for railroad purposes above mentioned. This possession was not adverse to the state, as to the fee, but was attributable solely to the right of possession by virtue of the franchise and permits. It did not set the statute of limitations in motion, and could not support a title by prescription to any subordinate estate in the land. The land lying beyond the two-mile limit was not reserved at the time of the tide land purchase. Under the principles stated in the aforesaid opinion in L. A. No. 3060, the patent, as to this part, conveyed title to the patentee, subject to the public easements for navigation and fishery. This is all that could be gained by defendants by adverse possession, or statute of limitations. It is therefore unnecessary to consider the effect of adverse possession of the land outside of the two-mile limit.

With respect to the title under the state patent, the court made no finding of the fact that the Southern Pacific Railroad Company had, by mesne conveyances, succeeded to all the right and title of William L. Banning. This fact was proven and it is not disputed. This court, in the exercise of its appellate jurisdiction cannot make findings, and as this fact is essential to a proper judgment saving the rights of the defendants to the soil of all that part of the land lying south of the prolongation of the center line of Fourth Street aforesaid, subject to the public easement for navigation, it will be necessary to reverse the judgment in order that said defect may be supplied. The court below, upon the going down of the *remittitur,* will make a finding on this subject upon the evidence already given in the cause and such additional evidence as may be offered relating to the fact mentioned, and thereupon enter such judgment as the fact may warrant. If the railroad company has succeeded to said right and title

judgment will be given protecting their interests in conformity with the principles stated in the aforesaid opinion in L. A. No. 3060.

The order denying a new trial is affirmed except as below stated. The judgment is reversed with directions to the court below to proceed to take evidence and make the additional finding as stated in this opinion and render judgment in accordance therewith.

Angellotti, J., and Sloss, J., concurred.

BEATTY, C. J., concurring.—I concur in the judgment of reversal, and in the reasons fully set forth in the opinion of Justice Shaw in L. A. No. 3060, *ante,* p. 576, upon which the present judgment is based. It would be sufficient, I think, in remanding the cause for further proceedings to direct the superior court to quiet the title of the state to so much of the land described in the Banning patent as lies within the two-mile limit of the town of Wilmington as originally incorporated, and to quiet the title of the successors of Banning to the remaining portion of the land so described against all claims of the state except the rights reserved to the public by section 2 of article XV of the constitution. The case presented by the record does not, in my opinion, call for any elaborate discussion, or exact definition of the full extent of those rights, but since my associates have gone so fully into those questions I take occasion to state briefly my own views as to the effect of a valid conveyance of a portion of our tide lands, and to define, as well as I can, what, in my opinion, is the interest acquired by the patentee and what the nature and extent of the rights reserved to the state.

To this end it will not be unprofitable to give some preliminary consideration to the origin and nature of the state's title to its tide lands and lands underlying its navigable waters which, for brevity, may be called its submerged lands.

When the thirteen federated colonies achieved their independence of the British crown, each acquired the absolute ownership and dominion of the tide lands and of all other lands covered by navigable waters within their respective boundaries, with the possible exception of parcels of such lands as may have been included in valid grants antedating

the revolution. Over the lands so acquired each of those independent colonies or sovereign states possessed the same absolute power of management and disposition as king, lords and commons combined had before possessed. When, afterward, they formed a union by the adoption of our federal constitution they surrendered to the national government a paramount right of regulation and management of all their navigable waters necessary or convenient for the purposes of foreign or interstate commerce, but retaining to themselves all rights not incompatible with the right so surrendered. When, at a still later date, the United States acquired by treaties of cession extensive territories previously under the dominion of foreign states, the tide lands and lands covered by navigable waters within such territories became subject to the control and disposition of Congress except so far as the titles of prior grantees were protected by stipulations contained in the treaties of cession.

Anticipating the future conversion of these acquired territories into states, and with a view to their admission into the union upon terms of perfect equality with its original members, the government seems to have adopted the policy of reserving from sale for the future benefit of those embryo states the lands within their boundaries lying below the line of high tide. All that has been here said is illustrated by the history of California, and it results that, in fact as in theory, upon her admission into the union upon terms of equality with the states that formed the union she was endowed with the same powers over her navigable waters and tide lands that they possessed after their concession to the general government of a superior power of regulation for a particular purpose. The people of California therefore, subject to this sole qualification, have the power to manage and dispose of their tide and submerged lands in such manner as they may deem most advantageous. The alienation of such lands is a legislative act, and what the people may do the legislature may do except so far as its general power of legislation is restrained by special limitations in the constitution. Prior to the adoption of the constitution of 1879 there were no restraints upon its power relative to this matter and accordingly we find that for more than sixty years not only tide lands but submerged lands have been granted,

first by special acts of the legislature—as in case of the
water-front of San Francisco, Oakland, Benicia, etc.—and
later by subordinate agents acting under the authority of the
statutes referred to in Justice Shaw's opinion in L. A. No.
3060. To deny the power of the state to alienate its tide
lands is to deny the validity of the disposal of the water-
front of San Francisco. But who, at this day, would main-
tain the right of the state to have her title to that water-front
quieted against the claims of the present occupants? As to
the right and power of the state to convey into private own-
ership portions of its tide lands there ought to be no ques-
tion, and that right and power being conceded, it must be
admitted that it rests with the legislature to designate the
portions to be so conveyed and to prescribe the terms and
conditions of the grant, subject always to the constitutional
limitations upon its powers. Those limitations, so far as I
am aware, are all contained in article XV of the constitu-
tion, and, as they affect the question here, in section 2 of
that article, which reads as follows:

"No individual, partnership, or corporation, claiming or
possessing the frontage or tidal lands of a harbor, bay, inlet,
estuary, or other navigable water in this state, shall be per-
mitted to exclude the right of way to such water whenever
it is required for any public purpose, nor to destroy or ob-
struct the free navigation of such water; and the legislature
shall enact such laws as will give the most liberal construc-
tion to this provision, so that access to the navigable waters
of this state shall be always attainable for the people
thereof."

In construing grants of tide lands made before the adop-
tion of the present constitution the courts of this state had
established the doctrine that the rights of the grantee were
subject to the public right of navigation, and this clause of
the constitution in plain and concise terms makes that doc-
trine a part of our fundamental law. And when the funda-
mental law of the state, assuming the power of the legisla-
ture to alienate the tide lands, proceeds to define the rights
reserved to the public by its grants, the implication is that
they are the only rights reserved. If this is true, the terms
of the section above quoted leave little room for construction.
The grantee takes the entire estate and interest in the land

subject to free rights of way from the uplands to the water-front whenever they are required for *public* purposes. In the mean time he may subject the land to any use or alteration he may find profitable so long as he does not obstruct the free navigation of the bay, harbor, estuary, etc. If for instance his grant covers mud flats which can be filled in or otherwise reclaimed without detriment to the public right he may do so and *a fortiori* he may do what is advantageous to the public right—he may put structures upon the land and maintain them there until they are found to be a nuisance in a proceeding to declare them so—each case of this kind to be determined upon its own merits. In this connection I desire to say that the opinion of Justice Shaw goes too far where he says that in grants of tide lands there is reserved ''to the state, or its authorized agencies the right to enter upon such lands and make such erections thereon or changes therein as it may find necessary or advisable to adapt the premises for use in navigation or in furtherance thereof.'' This means, if I understand it, that where the grantee has done nothing to obstruct navigation, the state, to carry out any and every sort of plan of its agencies for the improvement of a harbor may take back the granted land without compensation. As to the question of compensation the passage of Justice Shaw's opinion above quoted is qualified in another place, but even with that qualification it goes too far. I concede that, if after selling a portion of its tide lands within a bay or natural harbor, the state should adopt a comprehensive plan of harbor improvement, such as the establishment of a harbor line and the construction of a sea-wall with docks and piers on that line, any tide land lying beyond that line would be subject to the superior right of the public upon equitable compensation being made to the vendee for his improvements taken, and since the vendee would at the same time become the absolute owner of that portion of the grant inside of the harbor line freed from the former servitude, its increased value might amount to full compensation for the portion and improvements lost.

I have not chosen to encumber this general statement of my views upon the matters so elaborately discussed in the opinion of Justice Shaw by citing the numerous authorities in point. Most of them are cited by him, including *Shively* v. *Bowlby*

(152 U. S. 29, [38 L. Ed. 331, 14 Sup. Ct. Rep. 548]), and *Illinois Central R. R. Co.* v. *Illinois* (146 U. S. 468, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 110]), upon which I mainly rely. In conclusion I refer—without quoting it here—to what I said concerning the doctrine of the last named case in my opinion in the Oakland water-front case, 118 Cal., pp. 182–83–84.

HENSHAW, J.—I agree in the main with the concurring opinion of the chief justice. I differ from the views expressed in the prevailing opinion, and perhaps from the views expressed by the chief justice over the question of the title taken by private owners under grants authorized by and made under the Tide Lands Act. So far as those grants were made after the effective date of section 2 of article XV of our constitution, no difficulty is presented. All such grants were taken subject to the restrictions and limitations of the constitution, and it is sufficient in the case at bar to direct the trial court to enter its decree so declaring, without here attempting to define the scope of those constitutional limitations before argument and in advance of a full presentation of the questions.

But upon the title taken under such grants made before the operative date of section 2 of article XV, my views differ radically from those expressed in the prevailing opinion, and while, by virtue of the fact that practically all of the lands here involved were acquired subsequent to the constitutional provision, the question is of no consequence in the present cases, yet as the court has unnecessarily gone into an elaborate consideration of the matter, it seems to me proper to express those views.

The power of the state to deal with and dispose of its tide and submerged lands (always under the recognized supreme power of the United States over them) has been stated over and over again by the supreme court of the United States to be absolute. Thus in *Hoboken* v. *Pennsylvania R. R. Co.*, 124 U. S. 656, [31 L. Ed. 543, 8 Sup. Ct. Rep. 643], it is said: "Lands below high water mark on navigable rivers are the absolute property of the state, subject only to the power conferred on Congress to regulate foreign commerce and commerce between the states, and *they may be granted by the state,* either to the riparian proprietors or to a stranger, as

the state may see fit.'' And in *Weber* v. *Harbor Commissioners,* 18 Wall. 57, [21 L. Ed. 798], it is said, concerning this class of lands in our own state: ''Upon the admission of California into the union upon equal footing with the original states, absolute property in and dominion and sovereignty over, all soils under the tide waters within her limits passed to the state, *with the consequent right to dispose of the title to any part of said soils* in such manner as she might deem proper, subject only to the paramount right of navigation over the waters, so far as such navigation might be required by the necessities of commerce with foreign nations or among the several states, the regulation of which was vested in the general government.'' Moreover, until the decision of *Illinois Central R. R. Co.* v. *Illinois,* 146 U. S. 387, [36 L. Ed. 1018, 13 Sup. Ct. Rep. 110], no court had ever held that the action of a state legislature in disposing of these lands was subject to judicial review upon the theory that any such disposition violated the state governmental trust upon which they were held. Still less was it ever adjudicated that a federal court would decree that a state had violated the state governmental trust upon which it held these lands, and that therefore a federal court (the supreme control of the United States government over the matter not being in question) would declare void a grant solemnly made by a state of any part of such lands.

The power of the state in dealing with such lands is *not* limited to the disposition into private ownership of such parcels as are to be used in aid of commerce. True, parcels may be so disposed of. The rule, however, is and always has been, and is so asserted and reasserted even by the majority in the Chicago water-front case, that the state may dispose into private ownership of parcels that are *not* to be used in aid of commerce, that are to be taken away from the possibility of commerce, provided this disposition does not impair the public trust to maintain sufficient of these waters and lands for purposes of navigation and commerce. Thus the state may not only sell such lands for the purposes of the construction of wharves, slips, warehouses, and the like, but she may sell them also to be wholly reclaimed from the sea, and when so reclaimed to be devoted to any one of the innumerable legit-

imate objects of modern civilization—stores, warehouses, factories, residences, or agriculture.

This, in varying language, is repeatedly said in the majority opinion in the Chicago water-front case. Thus, "it is grants of parcels of land under navigable waters that may afford foundation for wharves, piers, docks and other structures in aid of commerce, *and grants of parcels which being occupied do not substantially impair the public interest in the lands and waters remaining* that are chiefly considered and sustained in the adjudged cases as a valid exercise of legislative power."

The prevailing opinion discusses at length the acts of the state in offering for sale its tide lands at a fixed price, passes lightly over the fact that all such lands within cities and towns and within two miles of their boundaries were excluded from sale, and declares, from the nature of these granting acts, it is not to be assumed "that the state, which is bound by the public trust to protect and preserve this public easement and use, should have intentionally abrogated the trust as to all lands not within the very limited areas of the reservations, and directed the sale of any and every other part of the land along the shores and beaches to exclusive private use, to the destruction of the paramount public easement which it was its duty to protect, and for the protection and regulation of which it received its title to such lands."

From this view I utterly dissent. The whole legislation of the state of California demonstrates to my mind beyond peradventure that the legislature had keenly in mind its own powers and the limitations upon them; that it was well aware of the need of retaining sufficient of these lands (tide and submerged) for the free use and development of commerce, and that it did so by declaring that it would not grant into private ownership any of such lands, the private ownership of which might interfere with commerce and navigation, within from two to five miles of any city or town—wiser legislation than is found in the statute books of most states, and the only limitation upon the legislative power of sale fixed by the present constitution (art. XV, sec. 3); that it knew, while California had a coast line exceeding a thousand miles in length, that the harbors upon this line were very few. Cities and towns were then upon these harbors and it pre-

served the utmost freedom of commerce by refusing to sell
to private citizens any of these lands, not only within the
limits of cities and towns, but within from two to five miles
of the boundaries thereof. As to the rest of these lands the
offer of them by the state for sale was a declaration by the
state that they were not needed for purposes of public com-
merce and navigation; that their title and their use might
better go into private ownership, the lands to be reclaimed, if
they were susceptible of reclamation, and to be devoted to any
use to which, after reclamation they might be put, or to be
devoted to purposes of commerce, if along our inhospitable
shore some enterprising owner might find a cove, erect a
wharf, and build up a coastwise business. To say that such
an offer of sale means, as the prevailing opinion says, that
the state was always preserving the *jus publicum,* is to make
all the precautionary measures which the state actually
adopted vain and ridiculous. If the state in these public
offers of sale was retaining the *jus publicum,* it might just as
well have hoodwinked its citizens still further by allowing
them to purchase the lands which it reserved within the five
and two-mile limits of cities and towns. It could just as
freely have sold those lands and then made answer that it was
selling merely the *jus privatum.* What would be said if the
city of San Francisco should offer for sale in lots one of its
public parks, survey the lands, make sales, sweep the money
into its strong box, execute its deeds without reservation, and
when the purchaser came to take possession meet him with
the declaration that of course all that it was selling was the
*jus privatum,* which he could enjoy only when the *jus publi-
cum* was abandoned? We repeat that the state has shown no
disposition as yet to do this thing. But that it may be done
under the sanction of the prevailing opinion there can be no
doubt, and I am compelled to dissent from the view that any
principle of law or equity countenances such a statutory con-
struction.

It is said in the prevailing opinion that in our decisions upon
the titles to these tide lands "the double right of the state, pri-
vate and public, does not seem to have been suggested or con-
sidered." The answer to that is complete. The earlier judges
of this court were not, as is implied, ignorant of the common
law. They had full knowledge of the governmental trust in

navigable waters of the *jus privatum* and the *jus publicum.*
Upon numerous occasions they evinced this knowledge.   Their
silence while reviewing the acts in question, like the silence of
the supreme court of the United States in the Chicago case,
arose from the fact that never until now was it supposed that
the sale by the state was anything other than a sale of all her
interest, that her patent, containing no reservation, was a dec-
laration that the lands sold could go into private ownership
without impairment of the state's governmental duty to pre-
serve enough of them for purposes of commerce and naviga-
tion.   Let us instance the very grant here under consider-
ation to show how utterly inapplicable the theory that by
them the state has abandoned or surrendered a public trust,
or that to construe the grants as I construe them, would be
the equivalent of declaring that the state had surrendered
such trust.   Let us take the known conditions existing in the
harbor of San Pedro.   Speaking generally, the uplands about
that harbor have been incorporated with the city of Los An-
geles.   The city of Los Angeles admittedly owns, for public
purposes, harbor lands and facilities for wharfage, dockage,
and slips, sufficient to accommodate the commerce of Liver-
pool and Antwerp combined.   There is not the slightest pre-
tense here made, and none can be made, that by sustaining
these grants the harbor of a great city is given over to pri-
vate ownership, or that the commerce of a great maritime
port is bottled up.   These particular grants are insignificant
in area and extent as compared with the lands for harbor
purposes unquestionably controlled and owned by the city of
Los Angeles, and yet we are asked to believe because certain
small fractions of the tide lands (not even the submerged
lands) have years and years ago been purchased and paid for,
that to uphold the complete ownership of those lands in the
private individual under a grant by the state, which in no
way limits that ownership, or even to say that the state should
in retaking them repay what it had received for them, is to
work some appalling destruction of a governmental trust.   As
wholly untenable to my mind is the general proposition that
to construe the state's offer to sell these tide lands as an offer
to sell its whole interest into private ownership works a de-
struction of the governmental trust.   First, there is the rea-
son already pointed out that the state has studiously reserved

CLXVI Cal.—40

from sale all the lands which it then considered necessary for purposes of public commerce, and, second, because the argument presupposes the purchase into private ownership of the whole coast line of California. Such an amazing result in all the years that have followed has of course never taken place; never could or would take place. The state knew of every sale which was made under its offer, and the state could at any time, if it considered that private owners were increasing too rapidly in number and its tide lands were being too rapidly taken over into private ownership, have repealed its laws and withdrawn its offer. To my mind the rational way to view the offer to sell, the only way indeed in which it must be viewed, is to take the case of Richard Roe, who has purchased a quarter of a mile of mud flats, who has reclaimed them from the ocean, who has built his home or factory upon them and who is now told that he must surrender possession without compensation at the demand of the state or any of its agencies, because all that he bought is a *jus privatum,* and if he contends that he bought more, then it must be answered that to hold with this contention is to destroy a great governmental trust.

I do not for one moment question the right of the state to retake any of such lands which she may have improvidently sold or which subsequently, by the growth and development of commerce, seem to her necessary for purposes of navigation. But I deny utterly that she can do this by way of confiscation, without payment to the private owner for his private loss. And I care not whether it be said that the lands were sold into private ownership in aid of commerce acting through private persons, or whether it be said that they were sold as land not necessary for commerce, or whether it be said that they were sold without any specific declaration or intent whatever upon the subject. If a citizen's private rights of property are to be taken after such a sale or grant, they are not to be taken under the fiction of a reserved *jus publicum.* They are to be taken under the actual *dominium eminens*—the right of eminent domain, and compensation must be made therefor, or else there is sheer confiscation. Therefore, I say that the construction put upon these grants of tide lands does violence to the law and that such construction if given execu-

tion violates the constitution of this state and of the United States.

Melvin, J., and Lorigan, J., concurred.