[S. F. No. 14804. In Bank.—January 29, 1934.]

CITY OF OAKLAND (a Municipal Corporation), Appellant, v. SAMUEL H. BUTEAU et al., Respondents.

Markell C. Baer, Port Attorney, Robert M. Ford, Assistant Port Attorney, C. Stanley Wood, City Attorney, and Homer W. Buckley, Assistant City Attorney, for Appellant.

Chapman, Trefethen, Richards & Chapman, William B. Bosley and Thomas H. Breeze for Respondents.

THE COURT.—Two appeals by the plaintiff are presented. The first is from a judgment confirming the title of the parties in and to certain property adjacent to San Antonio Estuary in Oakland Harbor; and the second is from an order fixing the amount to be paid by the plaintiff to the defendants for the use and occupation of a portion of said property. The appeal from the judgment will first be considered.

Prior to 1912 the defendants, as trustees of the Merritt Hospital, were the owners of real property in the city of Oakland bounded on the north by First Street, on the east by Washington Street, on the south by "ship channel", and on the west by the center line of Clay Street. On April 13, 1911, the city commenced proceedings to condemn said property for harbor purposes, intending thereby to acquire the title of the defendants to all of the property claimed by them within the street limits indicated, and southerly to the harbor on the south. The proceeding went to judgment and the amount of the award, to wit, $211,315.06, was

paid into court for the benefit of the defendants. The final order of condemnation was entered on February 10, 1912, and on the ninth day of the following month the court made an order letting the plaintiff into possession. The order of possession described the property in the same language as the judgment of condemnation which bounded the property on the south by the "northerly boundary line of ship channel in Oakland Harbor, which northerly boundary line of ship channel is the line of ordinary low tide of May 4th, 1852, and which northerly boundary line of ship channel is the southerly boundary line of the lands granted and released to the town of Oakland by an act of the legislature . . . approved May 4th, 1852". The lands granted to the town of Oakland were described in that act as the lands "between high tide and ship channel". (Stats. 1852, p. 180.) On an appeal from the judgment of condemnation by the defendants, the District Court of Appeal affirmed the judgment on August 23, 1917. (*City of Oakland* v. *Wheeler*, 34 Cal. App. 442 [168 Pac. 23].) A petition for hearing in this court was denied on October 18, 1917, and a writ of error to the Supreme Court of the United States was dismissed on October 7, 1920. (*Wheeler* v. *City of Oakland*, 254 U. S. 659 [41 Sup. Ct. 5, 65 L. Ed. 462].) During the pendency of the appeal a controversy arose between the plaintiff and the defendants as to the extent of the property included in the judgment of condemnation. The plaintiff took the position that the property acquired extended to the then existing line of low tide on the south, and the defendants contended that the southerly boundary of the property condemned was "ship channel" as the same existed on May 4, 1852, and that because of certain limitations in the special verdict of the jury in the condemnation case, they were still the owners by accretion of the area of land lying southerly from that line and extending to the low-tide line as the same existed at the time of the commencement of the condemnation proceeding. On February 23, 1912, the plaintiff commenced the present action to have it adjudged that it was the owner and entitled to the possession of the property between the land condemned, as it construed the judgment in condemnation, and the northerly pier-head line. The defendants were then maintaining a wharf on a portion of this property. The action was tried

and judgment entered in favor of the plaintiff on January 16, 1915. Following the entry of that judgment, to wit, on February 5, 1915, a writ of possession was issued and the plaintiff took possession of the disputed territory. On appeal by the defendants from that judgment the same was reversed on February 28, 1919. (*City of Oakland* v. *Buteau,* 180 Cal. 83 [179 Pac. 170].) During the pendency of that appeal the plaintiff, under the authority of said writ of possession, remained in possession of the disputed area and had constructed a wharf on a portion of the premises. On the appeal it was determined that "ship channel" or the low-tide line of May 4, 1852, was not the same as, but was northerly from, the low-tide line existing at the time of the commencement of the condemnation proceeding; that the land between those two lines was not included in the condemnation proceeding, and that the defendants were the owners of the land between said lines by accretion to their original estate.

Pursuant to the order of reversal the cause was remanded for a new trial. Pending the new trial proceedings, and on August 23, 1920, the defendants presented to the trial court a motion for an order to restore them to the possession of the property in controversy and to award to them the reasonable rental value of the use and occupation of the premises during the time they were out of possession and damages for the alleged failure of the plaintiff to maintain a certain wharf on a portion of the property which wharf had extended therefrom out to the navigable channel of the estuary. On January 27, 1922, the court made an order directing restitution of the disputed premises to the defendants, and directing that the matter of the claim for rental and damages be reserved pending the retrial of the cause on its merits.

On the retrial, which was commenced on December 4, 1922, it was of primary importance to fix and determine the line of low tide as the same existed on May 4, 1852, and the line of low tide as the same existed at the time of the retrial. The court took evidence as to the location of the lines in controversy and fixed the line of low tide as of May 4, 1852, by metes and bounds, and in a general easterly and westerly direction from a point on the westerly line of Washington Street, 195⅓ feet south of the south line of

First Street to a point in the center line of Clay Street a distance of 306⅓ feet south of the south line of First Street. The low-tide line of 1852 as thus fixed is referred to in the record and briefs as the von Geldern line. This line is approximately midway between the southerly line of First Street and the present line of low tide.

South of the present line of low tide as so fixed by the judgment and approximately parallel thereto is the northerly pier-head line of the harbor as established by the United States Government, first in 1913 and again in 1925.

At the time of the commencement of this action the plaintiff was not the owner of the submerged land southerly from the existing low-tide line. However, pending the retrial and prior to the entry of the present judgment in June, 1924, the state granted to the city of Oakland those submerged lands. (Stats. 1923, p. 416.) The trial court gave recognition to this after-acquired title of the plaintiff and by its judgment decreed that by virtue of said grant the plaintiff is the owner of the parcel of land bounded on the north by the existing ordinary low-tide line, on the east by the center line of Washington Street produced southerly, on the south by the northerly pier-head line of Oakland harbor and on the west by the center line of Clay Street produced southerly, subject to the public right of navigation "and subject to the rights and easements possessed by the trustees", defendants herein. It was also adjudged that the defendant trustees are the owners and entitled to the possession of the parcel of land bounded on the north by the von Geldern line, on the east by the center line of Washington Street (subject to the public highway easement in Washington Street), on the south by the present line of ordinary low tide, and on the west by the center line of Clay Street produced southerly. It was also adjudged that the defendant trustees are "the owners and entitled to the possession and enjoyment, as an incident and appurtenance of the parcel or tract of land owned by them as aforesaid, of the right and easement of ingress to said parcel or tract of land from the navigable waters of said Oakland harbor, and of egress from said parcel or tract of land to said navigable waters; and possess the right of constructing, maintaining and using, for their own private use and as a means of exercising such right and easement of ingress and

egress, such wharves and structures not extending beyond the southerly boundary, as are or may be necessary and proper for that purpose without, however, obstructing or interfering with navigation on said navigable waters.''

The correctness and validity of those portions of the judgment which confirm the title of the plaintiff in and to the submerged land and to the defendant trustees the title to the land between the von Geldern line and the present low-tide line are not now attacked by either side. However, the plaintiff contends that the court erred in granting the defendant trustees a right of ingress and egress to and from their property over and across the plaintiff's submerged lands to navigable waters, and in adjudging that the plaintiff's ownership of said submerged lands is subject to such right of access in favor of the defendants.

The plaintiff attacks the objectionable portions of the judgment on three general grounds; first, that the defendants are estopped by the judgment in the condemnation case from now claiming such right of access; secondly, that they are foreclosed from now claiming that right by the law of the case as established on the former appeal, and thirdly, that under the law they are not otherwise entitled to such right.

█ In presenting their several claims for compensation and damages in the condemnation suit the defendant trustees asserted a wharfing out right to and upon navigable waters, and a right of access to the navigable waters of the harbor for such purpose. They requested an instruction in recognition of that right. The instruction was refused and such refusal was specified on the appeal as reversible error. In passing upon the point the reviewing court determined that the defendants had no title to the land below low tide, could not secure such right by adverse possession, had no right of access to navigable waters from their property and had shown no right upon which they could base a claim for damages to or compensation for the same. In this connection the court said: ''The court . . . refused to instruct as matter of law that the defendants had such wharfing out right. It might have instructed that they had, at the time of the issuance of the summons, no such right, for it has been settled in *Dalton & Sons* v. *Oakland,* 168 Cal. 463 [143 Pac. 721], that owners of the land upon the littoral of a

navigable bay have no right of access to deep water over intervening tide lands. *Western Pacific R. Co.* v. *Southern Pacific R. Co.*, 151 Fed. 376 [80 C. C. A. 606]." (*City of Oakland* v. *Wheeler*, 34 Cal. App. 442, at page 453 [168 Pac. 23, 28].)

Although the city of Oakland was not the owner of the submerged land at the time of the issuance of the summons in the condemnation suit, that case obviously was tried on the theory, so far as the defendants were concerned, that they were the owners of a valuable right of access to navigable waters and that the taking of the lands intended to be condemned in that action would deprive them of that right. The issue of the right of access now asserted would seem to have been definitely tendered by them in the trial of that action and on appeal and under well-settled principles they should not again be permitted to relitigate that issue, since all of the elements of an estoppel by judgment are present.

The act of May 4, 1852, granted to the town of Oakland the lands lying within the boundaries of the town fixed by the act "between high tide and ship channel". An ordinance of the town of Oakland, enacted May 27, 1852, authorized a deed conveying to Carpentier, the defendant trustees' predecessor in interest, "the waterfront of said town, that is to say, all the land lying within the now corporate limits of the Town of Oakland and situated between high tide and 'ship channel' ". The deed carried the same description. The defendants therefore claim that their predecessor thus acquired the "waterfront" which is something more than merely the lands between high and low tide. But the town of Oakland could not convey to Carpentier more than it had received from the state, and it had received from the state only the lands "between high tide and ship channel". When, therefore, the town granted the "waterfront" it must be deemed to have granted only what is possessed, namely, the lands between high tide and ship channel.

For many years the meaning of the term "ship channel" was uncertain and undefined. It was indicated if not definitely decided in *City of Oakland* v. *Oakland Water Front Co.*, 118 Cal. 160 [50 Pac. 277], that the term meant the ordinary line of low tide. The defendants

claimed on the prior appeal in this case and now claim that the definition of the term as the low-tide line is too restrictive and limited; that it means something more than a mere boundary line, and imports a right of access to navigable waters. But it was definitely decided on the former appeal in this case that the term meant the line of low tide. That determination has become the law of the case, and the defendants would seem to be now foreclosed from contending otherwise. We think that the term as so used and now defined indicates no more than a boundary line, and the term has no significance other than to form the southern boundary of the defendants' land as confirmed to it in the judgment, and cannot be enlarged to import a right of access to navigable waters.

At the time the present action was retried neither the plaintiffs nor the defendants were the owners of the submerged land now under consideration. Title thereto was then in the state of California. The state acquired that title upon its admission to the Union, subject only to the power of Congress to regulate foreign commerce and commerce between the states. (*Weber* v. *Board of State. Harbor Commrs.*, 18 Wall. 57 [21 L. Ed. 798]; *Hoboken* v. *Pennsylvania R. R. Co.*, 124 U. S. 656 [8 Sup. Ct. 643, 31 L. Ed. 543]; *People* v. *Southern Pac. R. R. Co.*, 166 Cal. 614 [138 Pac. 94].) By the Constitution of 1879 this title was safeguarded to the extent that ''No individual . . . claiming or possessing the frontage or tidal lands of a harbor, bay, . . . estuary, or other navigable water in this state, shall be permitted to exclude the right of way to such water whenever it is required for any public purpose, nor to destroy or obstruct the free navigation of such water.'' (Const., art. XV, sec. 2.) Upon the adoption of this article the state continued to hold its tide and submerged lands in its sovereign capacity and in trust for the people of the state. (*People* v. *California Fish Co.*, 166 Cal. 576 [138 Pac. 79]; *Ord Land Co.* v. *Alamitos Land Co.*, 199 Cal. 380 [249 Pac. 178].) Upon the grant to the city in 1923 of the submerged land under consideration, the city held the title upon the same trusts and for the same uses and purposes as were attached to the state's title. (*Oakland* v. *E. K. Wood Lumber Co.*, 211 Cal. 16 [292 Pac. 1076, 80 A. L. R. 379]; *City of Los Angeles* v. *Anderson*, 206 Cal. 662 [275 Pac. 789];

*Patton* v. *Los Angeles,* 169 Cal. 521 [147 Pac. 141]; *Los Angeles* v. *Pacific Coast S. S. Co.,* 45 Cal. App. 15 [187 Pac. 739].) These uses and purposes include the right on the part of the state or its lawful grantee to hold, control and improve said lands in furtherance of the public uses of navigation, commerce and fishery. (*People* v. *Southern Pac. R. R. Co.,* 169 Cal. 537 [147 Pac. 274].)

 Considering the question of the rights of the defendants as owners of the littoral above the low-tide line, it appears that the defendants concede that if by the use of language in the original grant to the town of Oakland it was intended that the waterward boundary of the lands so granted be fixed and that the southern boundary of their lands was fixed thereby, then the plaintiff would have the right to fill or otherwise improve for purposes of navigation and commerce its submerged land southerly from the low-tide line and thus interfere with and entirely cut off the defendants' access to deep water. Since it has been considered and decided that by use of the term "ship channel" in the original grant the southerly boundary of the defendants' land was fixed as the low-tide line, it would follow that the plaintiff has the right to fill or otherwise improve its submerged land for any purpose not inconsistent with the trusts upon which said land is held by the plaintiff and freed from any right of access on the part of the defendants to navigable water. There is no showing that the plaintiff is intending to improve its submerged land in any way inconsistent with the grant from the state, or arbitrarily or capriciously to deprive the defendants of any right which they may lawfully exercise, and it cannot be assumed that it will do so.

Furthermore, in *Dalton & Sons* v. *Oakland,* 168 Cal. 463 [143 Pac. 721], it was held that the littoral owner of land on a navigable bay has no right of access to deep water over intervening tide lands which the state has granted to a city in trust for the purpose of improving its harbor in aid of commerce and navigation. We are satisfied that the same rule applies to any right of access to deep water over intervening submerged lands granted to the city, even though title to the land above the low-tide line has passed to the littoral owner. The case of *Shirley* v. *Bishop,* 67 Cal. 543 [8 Pac. 82], relied upon by the defendants, involved

the right of access to navigable waters on behalf of the owner of the littoral who also owned the land extending out to the navigable waters of the Straits of Carquinez, and it was held that such owner had a vested right of access to such navigable waters. (See, also, *Shirley* v. *City of Benicia,* 118 Cal. 344 [50 Pac. 404].) Such is not this case, for the reason that the defendants herein are not the owners of the land extending to navigable water. The land of the plaintiff intervenes. It is true that the littoral owner has such right of access as against a stranger, but this right is not available to him against the state or the grantee of the state using or as here taking definite steps to use the tide lands or the submerged lands or both for public purposes. (*San Francisco Sav. Union* v. *R. G. R. Petroleum Co.,* 144 Cal. 134 [77 Pac. 823, 103 Am. St. Rep. 72, 1 Ann. Cas. 182, 66 L. R. A. 242]; *Boone* v. *Kingsbury,* 206 Cal. 148 [273 Pac. 797].)

The judgment herein purports to grant to the defendants the right of access to navigable waters, as an incident and appurtenance attached to their land, over and across the land of the plaintiff. This grant is permanent and unconditional except that the exercise of the right granted shall not obstruct or interfere with navigation upon such navigable waters. The exception, however, does not save the grant of the easement. Even though the defendants owned in fee the lands confirmed in the plaintiff, the exercise of their rights under that title would not of itself permit them to obstruct or interfere with navigation on the navigable waters of the bay.

We conclude that the judgment herein is erroneous in so far as it purports to vest in the defendants any right of access to navigable water from their land over and across the land of the plaintiff.

Following the entry of the judgment on the first trial, and on February 5, 1915, the plaintiff went into possession of the land now confirmed to the defendants, under and pursuant to a writ of possession issued by the trial court authorizing it so to do, and it remained in possession until January 27, 1922, when the defendants were restored to possession of their land by an order made on their motion. The court held in abeyance the matter of fixing the rental value and damages pending the determination of the ques-

tion of title and boundaries. No appeal was taken from the order of repossession of January 27, 1922, and the defendants appear to claim some advantage because no such appeal was taken. It is unnecessary to discuss the point further than to say that the order was plainly interlocutory in character. It was also in the nature of an order *pendente lite* and was obviously made for the purpose of preserving the *status quo ante*.

After the trial court had decided the question of title and boundaries an order was made on June 27, 1924, fixing the rental value of the defendants' premises during the time they were out of possession and the amount of their claim for damages. The order is erroneous in several particulars.

First, it includes in the description of the property the possession of which is accorded to the defendants the land between the low-tide line and the northerly pier-head line of the harbor. This is not in accord with the judgment which confirms title of the submerged land to the plaintiff.

Secondly, during the occupancy of the disputed premises by the plaintiff, the plaintiff constructed a wharf and warehouse which occupies the land lying between the easterly and westerly lines of Clay Street and extending from the pier-head line to a point northerly from the northerly boundary line of the defendants' property. A portion of this improvement is upon the defendants' land, and the order found the portion of the improvement so occupying the defendants' land to be 46.4 per cent of the whole. This percentage is concededly erroneous for the reason that a portion of said 46.4 percentage is located on the land of the plaintiff lying westerly from the easterly line of Clay Street produced southerly and southerly from the low-tide line. The correct percentage and the amount to be charged against the plaintiff based on the correct proportion can properly be ascertained only by a retrial of that issue.

Thirdly, the order purports to require delivery of possession to the defendants of the submerged land owned by the plaintiff. It is conceded that any portions of the order inconsistent with the judgment are controlled by the latter. The judgment established the title of the respective parties and the right of possession would follow the title. The form of the order purports to award to the defendants the value

of the use and possession of the entire tract, including the lands confirmed to the plaintiff. In these respects the order was clearly erroneous. If the order intended to include compensation for the deprivation of the asserted right of access to navigable waters over and across the lands of the plaintiff, it was also erroneous in that respect, for, as has been seen, no such right of access existed.

Fourthly, the court fixed the compensation for the detriment suffered by the defendants apparently in accordance with the rule laid down in section 3334 of the Civil Code. The court fixed the amount on the basis of the "reasonable net rental value of said premises" for the period during which the defendants were out of possession and otherwise described the basis for the ascertainment of the amount as "the amount representing the net rent and income reasonably to be expected from said premises for said period of time if they had been managed with ordinary care and diligence", and fixed the amount at $39,110. Section 3334 of the Civil Code provides: "The detriment caused by the wrongful occupation of real property . . . is deemed to be the value of the use of the property for the time of such occupation." But the possession of the plaintiff during the period in question could not be deemed a wrongful or an unlawful occupancy. Possession was taken pursuant to the writ of possession issued in accordance with the judgment and order of the court. The writ was not superseded and until a reversal of the judgment constituted a justification for the occupancy as against a charge of wrongful possession. The plaintiff was in possession in good faith. Its possession was not that of a trespasser, nor was it tortious in any sense, and there is no ground for the charge that the property was not caused to produce as much revenue as could be expected under good management and under the circumstances disclosed by the record. The rule therefore to be applied is to hold the plaintiff to account for the money or property received by it under the judgment and writ of possession and to the extent of the liability applicable to a trustee (*Ward* v. *Sherman,* 155 Cal. 287 [100 Pac. 864]; *Asato* v. *Emirzian,* 177 Cal. 493 [171 Pac. 90]), or to the liability analogous to that of a litigant who has received the proceeds of a sale had under an erroneous judgment thereafter reversed. Such liability is limited to the amount

received after deducting the statutory costs. (Sec. 957, Code Civ. Proc.; *Dowdell* v. *Carpy,* 137 Cal. 333 [70 Pac. 167].) In either case the law proceeds upon the theory that, in equity, the party who receives money or property in good faith under an erroneous judgment thereafter reversed, should be required to restore what he has received, and not upon the theory of a supposed wrong committed. While the contrary rule was announced in *Hays* v. *Griffith,* 85 Ky. 375 [3 S. W. 431, 11 S. W. 306, 9 Ky. Law Rep. 65], that case was overruled in *Bridges* v. *McAlister,* 106 Ky. 791 [41 S. W. 603, 21 Ky. Law Rep. 428, 90 Am. St. Rep. 267, 45 L. R. A. 800]. (See, also, *Schnabel* v. *Waggener,* 118 Ky. 362 [80 S. W. 1125, 26 Ky. Law Rep. 258]; *Hess* v. *Deppen,* 125 Ky. 424 [101 S. W. 362, 31 Ky. Law Rep. 15, 15 Ann. Cas. 670].) By the great weight of authority the generally accepted rule is that when a judgment is reversed under the circumstances here shown, restitution must be made of all that has been received under it and no further liability should be imposed. (*Rabb* v. *Patterson,* 42 S. C. 528 [20 S. E. 540, 46 Am. St. Rep. 743]; *Murray* v. *Berdell,* 98 N. Y. 480; *State Nat. Bank* v. *Ladd,* 65 Okl. 14 [162 Pac. 684, L. R. A. 1917C, 1176]; 4 Cor. Jur. 1235.)

We therefore conclude that judgment should be entered confirming the title of the respective parties as provided in the judgment appealed from without any right of access in the defendants to and from navigable waters over and across the lands of the plaintiff; and that an accounting should be had as between the parties of the receipts and disbursements of the plaintiff arising out of the occupation by the plaintiff of the defendants' property in reliance upon the judgment which was reversed.

The judgment and the order are and each is reversed, and the cause is remanded to the trial court for further proceedings not inconsistent with the views herein expressed.

Waste, C. J., deeming himself disqualified, did not participate herein.

Rehearing denied.

Curtis, J., and Preston, J., dissented. Waste, C. J., deeming himself disqualified, did not participate in proceedings on petition for rehearing.