[Civ. No. 11986.   First Dist., Div. One.   Apr. 17, 1944.]

SAMUEL L. CARPENTER, JR., as Insurance Commissioner, etc., Plaintiff, v. CITY OF SANTA MONICA, Respondent; THE PACIFIC MUTUAL LIFE INSURANCE COMPANY OF CALIFORNIA (a Corporation), Intervener and Appellant.

Hanna & Morton, Byron C. Hanna and James Kirby for Appellant.

O'Melveny & Myers, Louis W. Myers and Jackson W. Chance as Amici Curiae on behalf of Appellant.

Hill, Morgan & Bledsoe, Vincent Morgan and Stanley S. Burrill for Respondent.

PETERS, P. J.—The plaintiff, the Insurance Commissioner of the State of California, as conservator of the Pacific Mutual Life Insurance Company of California, instituted this action against the city of Santa Monica for damages for the taking or damaging of the real property alleged to be owned by the insurance company and alleged to have been caused by the construction of a breakwater by the city in the harbor. The insurance company intervened and is the appellant. The parties stipulated that the issue as to the amount of damages should not be tried until after the court had first determined whether there was any liability on the part of the city in the circumstances. The trial court determined that the city was not liable for the alleged damage, and, as a result, that issue was not tried.

The appellant acquired title to certain beach properties in the city of Santa Monica in October of 1934. The property is improved with a nine-story building, designed and used exclusively as a beach club. The southwest boundary of this land is the mean high tide line of the Pacific Ocean. Prior to July of 1933 there was a wide beach between the club house and the water. In that month the city commenced the construction of a breakwater in the harbor some 2,000 feet offshore and north and west of the property of appellant. The breakwater was completed in July of 1934. By reason of the construction of this breakwater the currents of the ocean have been interfered with, and the water has been so quieted that sand which would otherwise be carried to appellant's property no longer is carried there. The result has been that erosion has taken place which has washed away a large portion of the beach in front of the appellant's property. In 1936 appellant acquired assignments from its immediate predecessors in interest of all claims that they might have against the city for damages resulting from the construction and maintenance of the breakwater. In October of 1936 the Insurance Commissioner, as conservator, filed a written claim with the city for the damages, and, upon its rejection, this action was commenced in November of 1936. The prayer of the complaint is for $178,000 damages.

The trial court found that the city was not liable for the erosion caused by the construction of the breakwater. It based this conclusion on several theories. It held that in the construction of the breakwater the city acted in its governmental capacity and under its police power, exercised for the purpose of protecting its harbor and property, and to promote and accommodate commerce and navigation. It also determined that the city had the legal right to protect its harbor and its property and the property of others within its boundaries from the action of the ocean, and that the city constructed the breakwater for such purposes; that in doing so it was protecting itself and its property owners from a common enemy; that any damages arising from the construction and maintenance of the breakwater were and are *damnum absque injuria*. So far as these theories are concerned, the problems involved are similar to those involved in *Miramar Co.* v. *City of Santa Barbara,* 23 Cal.2d 170 [143 P. 2d 1], recently decided by the Supreme Court. In that case,

three of the justices held that damages caused to the upland owner by the construction of such a breakwater were *damnum absque injuria;* three held that the upland owner was entitled to damages; and one held that the claims statute was applicable to such a proceeding. Subsequently, the Supreme Court in the case of *Natural Soda Prod. Co.* v. *City of Los Angeles,* 23 Cal.2d 193 [143 P.2d 12], by a six to one vote, determined that the claims statute has no application to such cases. Inasmuch as the Supreme Court was equally divided on the issues above set forth it is obvious that the decision in that case does not constitute a decisive or even helpful authority in the instant case.

In the present case, the trial court, in addition to the theories above mentioned, based its judgment denying recovery to appellant on another theory not discussed in the Miramar case. It made detailed findings to the effect that all of the eroded beach had been artificially created by man made structures erected in Santa Monica Bay, and held that accretions so formed do not belong to the upland owner but belong to the state or its grantee as the owner of the tide and submerged lands bordering the ocean. If these findings are supported, and if the legal conclusion based thereon is sound, they alone support the judgment regardless of the correctness of the other holdings of the trial court above mentioned.

The property here involved is within the city limits of the respondent city. In 1917 the state Legislature granted to the respondent city "all the right, title and interest of the State of California, held by said state by virtue of its sovereignty, in and to all the tidelands and submerged lands, within the present boundaries of said city, and situated below the line of mean high tide of the Pacific Ocean, to be forever held by said city, and by its successors, in trust for the uses and purposes, and upon the express conditions following, to wit:

"*(a)* Said lands shall be used by said city and by its successors, solely for the establishment, improvement and conduct of a harbor and for the establishment and construction of bulkheads or breakwaters for the protection of lands within its boundaries, or for the protection of its harbor, and for the construction, maintenance and operation thereon of wharves, docks, piers, slips, quays, and other utilities, structures and appliances necessary or convenient for the promotion or accommodation or commerce and navigation, and the protection

of the lands within said city. . . ." (Stats. of 1917, chap. 78, p. 90.) The city is prohibited from conveying the lands away, but may grant franchises or leases for periods not to exceed twenty-five years for purposes consistent with the trusts upon which the lands are held by the state. The submerged and tide lands so conveyed to the city are, of course, held in trust by it for the public under this grant from the state. The control of the state, and its grantees, for the purposes of the trust can never be lost except as to the portion that may be disposed of without impairment of the public interest, and then only upon express legislative authority. (*People* v. *California Fish Co.*, 166 Cal. 576 [138 P. 79]; *United States* v. *Chandler-Dunbar etc. Co.*, 229 U.S. 53 [33 S.Ct. 667, 57 L.Ed. 1063]; *Forestier* v. *Johnson*, 164 Cal. 24 [127 P. 156]; *People* v. *Kerber*, 152 Cal. 731 [93 P. 878, 125 Am.St.Rep. 93].)

It is an admitted fact that the appellant deraigned its title from a United States patent issued by act of Congress confirming a prior Mexican grant entitled to confirmation under the Treaty of Guadalupe Hidalgo, and that the oceanward boundary line of appellant's property is described in the original patent as the line of ordinary high tide of the Pacific Ocean.

In its amended findings of fact the trial court found that "the shore of Santa Monica Bay extends southeasterly in a long shallow crescent from Point Dumé on the north to Point Vicente on the south; that the prevailing westerly winds create a wave action in the bay which meets the shore obliquely, resulting in a gentle and almost continuous shore current or littoral drift southerly along the shore. As the breaking waves stir up the sands of the beaches this shore current picks them up, holds them in suspension long enough to deposit them southerly along the shore, where the process is repeated continuously. When not artificially interfered with the effect of this continuing erosion is constantly overcome by the supply of new sand material seasonably washed down from the hinterlands by the run-off of storm waters through canyons and creeks. Since the year 1900 and possibly for some years prior thereto, this sand supply has been increased from time to time by man's operations along the shore line, such as the construction of roads and the blasting out of cliffs. Man's activities in the hinterlands in the building of cities, roads and other improvement[s] have, in some instances, caused a

greater run-off of storm waters than formerly and has created a greater supply of sand materials than was the case before such operations became extensive on the Pacific Coast.

"Where groins, piers and other structures are built into the ocean from the beach, they interfere with the littoral drift and cause the drifting sands to be trapped and deposited on the shore immediately to the north thereof, where such structures are impervious, but if not impervious, as in the case of piers, the piling of the piers interferes with the littoral drift, causing a similar deposit of sand, but much sand passes through the piling and is deposited on the shore immediately to the south of such structures, thus building out the beach on both sides thereof. In a short time the groins become filled with sand, but the beach to the northerly thereof continues to accrete and gradually fill out, in the case of groins, as much as thirty times the length of the structure from the mean high tide line seaward. The space between the pilings under large piers fills up more slowly but as it fills up it makes the pier more or less impervious to the flow of sand through it, whereupon it becomes effective as an impervious groin. After the groin or other structure has been filled to capacity, the sands again drift around the end of the groins and supply the beaches to the south.

"Since the year 1870 there have been numerous structures erected along the shore line of the City of Santa Monica, which have interfered with the littoral drift of the ocean and have caused the shore line to accrete because of the entrapment of the sands by reason of the structures.

"That none of the activities of man in the hinterlands hereinbefore referred to, was conducted or carried on, and that none of said structures hereinbefore referred to was erected or maintained by the intervener, or by intervener's predecessors in interest, and that neither intervener nor intervener's predecessors in interest has or have done anything whatsoever to contribute in any manner to such accretions. That such accretions have formed gradually and imperceptibly." (Finding XI.)

In Finding XII, after finding that the boundary of appellant's property is a meander line along the line of ordinary high tide of the ocean, and that the present location of the meander line is indefinite, the court found:

"That in the year 1876, or shortly prior thereto, the federal government, through its Coast and Geodetic Survey,

caused a survey to be made of the shore line of Santa Monica
Bay, including the shore line as it then existed in front of
the properties now owned by the intervener. That said sur-
vey was and is subject to a possible error of 33 feet on either
side of the mean high tide line as plotted on the map thereof
due to the conditions under which it was made and the meth-
ods used in making it. . . .

"That by 1933, the year in which the construction of the
breakwater commenced, there was a sandy beach of approxi-
mately 185 feet in depth seaward of that portion of the
Promenade between Pico Boulevard and Vicente Terrace in
the City of Santa Monica, between which streets the property
of the intervener hereinbefore described is located. Said
Beach was formed gradually and imperceptibly between the
year 1876 and the year 1933.

"That the beaches in Santa Monica Bay and those in front
of said property of the intervener were in a state of equi-
librium for a long period of time prior to 1876, and now
would be, in a state of nature, in a state of equilibrium.

"That along the shore line of Santa Monica Bay it is only
where there have been groins, piers, and other structures
erected by man which have trapped the sand being conveyed
by the littoral drift or current, that there has been any pro-
grading of the beaches, and throughout the bay area where
the shore has not been affected by such activities of man, the
beach remains in a state of equilibrium and has not pro-
graded seaward from the line of 1876.

"That the property of intervener lies approximately 2000
feet southerly of the southerly end of the breakwater. That
by reason of the construction of the breakwater the currents
of the ocean have been interfered with and the littoral drift
or current has been so quieted that it does not carry the nor-
mal amount of sand along the shore, but has caused a large
amount of sand to be deposited northerly of the location of
the property of intervener, and as a result thereof, the nor-
mal amount of sand has not been carried to or upon the shore
line in front of the property of intervener which has caused
an erosion of the shore line at that place.

"That all of said property which has been so eroded con-
sists of artificial accretions due to the activities of man, and
particularly the construction of piers and other structures in
and along Santa Monica Bay in the vicinity of the property
of intervener. That such accretions were formed gradually

and imperceptibly and that none of said activities was conducted or carried on and that none of said piers or other structures was erected or maintained by the intervener or intervener's predecessors in interest, and that neither intervener or [sic] intervener's predecessors in interest has done or have done anything whatsoever to contribute in any manner to such accretion.''

Based on these findings, the trial court, in its conclusions of law, found:

''That the intervener is not the owner of any lands claimed to have been injured by erosion, but that said property so eroded is artificially accreted land and constitutes filled tide lands belonging to the defendant City of Santa Monica'' under the provisions of the 1917 statute above referred to, ''and that none of the lands of intervener have been damaged by reason of the construction of the breakwater of the City of Santa Monica, but that the lands so eroded by reason of said construction of said breakwater are, as aforesaid, tide lands belonging to the City of Santa Monica.'' The judgment follows almost exactly the terms of the conclusion of law above quoted.

■ Appellant seriously challenges most of the findings above quoted, contending that, insofar as it is found that in 1876 the beach was in equilibrium, that the beach is not naturally a prograding beach and that all of the eroded area was artificially accreted beach, the findings are totally unsupported. There can be no doubt but that some of appellant's experts testified that the beach here involved is a naturally prograding beach. It was their theory that the eroded area was composed of natural accretions, and that the erection of piers, wharves and groins, and the other activities of man described in the findings, only had a slight effect on the rate of accretion. The appellant, by relying heavily on the testimony of its own experts, and by quoting isolated sentences from the testimony of respondent's experts, creates the impression that all of the experts were more or less agreed that the accretions in front of this property were the result of both natural and artificial causes, differing only as to the degree each cause affected the area. However, a fair reading of the testimony of respondent's experts, all men of wide experience and training in this highly technical field, demonstrates that they testified that this beach, in a state of nature, was in equilibrium, was not prograding, and that all

of the accretions affected by the erosion were artificially created as described in the findings. In fact, several of appellant's witnesses testified that the area involved was not one of accretion under natural conditions. Respondent's witnesses were positive that all of the accretions were artificially caused by the works of man. Thus Howard D. Carter, City Engineer of the City of Santa Monica, who has an intimate knowledge of the Santa Monica area, testified as to the location of the many piers and wharves in the area here involved, and further testified:

"I have studied the effect which the various structures that are in Santa Monica Bay had upon the beaches lying immediately north and south of these piers and between them, and have come to a conclusion as to the cause of the accretions that existed between these piers and structures. The cause of these accretions has been the slowing down of the littoral drift due to the number of pilings in each pier. . . . The different surveys made following 1876 show that between 1876 and 1933 the beach had been built seaward, or, in other words, had accreted, at the property of the intervener. I would say that all structures placed there by man had considerable influence on the building up of the beach.

"In my opinion the accretions which lie in front of the plaintiff's property would not have accrued to that property by reason of the forces of nature alone. The line of mean high tide in 1933 and at the present time, if the man-made structures that I have referred to had not been constructed, would in my opinion have been along the 1876 line, considering the error that the United States Coast Geodetic Survey remarked about. In my opinion, the beach in the vicinity of the plaintiff's property has not been a prograding beach, because the condition as shown on the 1876 line must surely have been a condition which was established over a great many years, probably ten thousand. If it had been a prograding beach I would not have expected to have found that narrow width of beach which the line of 1876 purports to show it had."

This witness described in detail the condition of the beach over the years, and then testified: "When you try to analyze the reason for the accretion of the beach between 1876 and 1921, I think there must be something of an artificial nature that caused it. If it had been going on for centuries, I can't see why we would not have beaches five miles wide. If we

had a naturally prograding beach in this bay, which must have continued for thousands and thousands of years, this bay would have a beach approaching a line between Point Dumé and Point Vicente.'' The witness then described the vast quantities of material that were dumped into the bay during the development of the various subdivisions in Santa Monica and as a result of the building of the coast highway and the railroad. · He estimated that seven million cubic yards of material were dumped into the sea during the construction of the state highway in this area, and that a half million cubic yards were deposited therein as the result of slides in the first three years after its construction. He again stated positively that the beach at Santa Monica was not a prograding beach, and that such beach, in a state of nature was in equilibrium, and pointed out: ''If the beach prograded only an inch a year we would have have a wide expense [expanse] of beach in the eighty thousand years geologists ascribe to the recent° epoch.'' He then pointed out that on other beaches where there were no man-made structures there was either erosion behind the 1876 line, or at least there were no accretions beyond that line. In this connection he mentioned particularly Manhattan Beach, a short distance south of the area in dispute, where there was a portion of the beach where the piers are separated by a distance of three miles. In that area there was erosion rather than accretions. Various early subdivision maps of the general area were introduced during this witness' testimony. They demonstrated that all of the early subdividers had located the seaward boundary lines of their subdivisions within 20 to 30 feet of the 1876 line of mean high tide, allowing for the possible error of 33 feet above mentioned. Various deeds of about 1900, or thereabouts, fixed the seaward boundary line of appellant's property, or of adjacent property, within only a few feet of the 1876 line.

The witness A. G. Johnson was an expert of wide experience and training in this field. He also testified that where man made structures had not interfered with the littoral drift in this area the beach was either eroded, or the mean high tide line was as fixed in the 1876 survey. He stated positively that the accretions attaching to this beach were caused by the piers, wharves, etc., and by the material dumped into the sea during the construction of the highway, and concluded with this opinion: ''If none of the structures here

mentioned had been erected by man and the beach from Santa Monica Canyon to Playa del Rey was in a state of nature, the 1933 line of mean high tide would, in my opinion, be in approximately the same position as in 1876.''

The respondent's witnesses Morrough Parker O'Brien, chairman of the Department of Mechanical Engineering at the University of California, and an engineer of wide experience and training, and Major George Elliott Verrill, a civil engineer connected with the United States Engineering Service for many years, corroborated these two witnesses in all particulars. They likewise concluded that this breach was not a naturally prograding beach, and that the accretions accruing since 1876 were the result of the many activities heretofore described and were therefore artificial accretions.

The testimony of these witnesses amply supports the findings heretofore quoted. Appellant attacks their testimony and requests this court to set these findings aside, claiming that the conclusions are unsound and contrary to some physical facts of which it requests this court to take judicial notice. The questions as to whether this beach, in a state of nature, was in a state of equilibrium, or whether it was a prograding beach, whether the eroded area was built up by natural or artificial accretions, or was the result of both natural and artificial causes, were questions the answers to which lay peculiarly within the knowledge of experts in this field. The experts for respondents were amply qualified to give their opinions on this subject. After reading all of the evidence on this issue, we are convinced that the findings are not only amply supported by substantial evidence, but that the great weight of the evidence supports the opinions given by respondent's witnesses upon which the findings are based.

From this analysis of the facts, it must be taken as established on this appeal:

1. That the beach in front of appellant's property is not a prograding beach;

2. That in a state of nature the beach from 1876 to the time of this trial was in a state of equilibrium;

3. That all of the accretions that occurred between 1876 ·and 1933 were artificial accretions caused by the man made structures and the activities heretofore described;

4. That all of the area that has been eroded as a result of

the construction of this breakwater was artificially accreted land;

5. That neither appellant nor its predecessors contributed to the activities causing these accretions;

6. That such accretions formed gradually and imperceptibly.

The legal problem presented by these facts is who owns that portion of the beach formed by such artificial accretions below the line of mean high tide as such line would exist in a state of nature? Appellant, assisted by counsel appearing as amicus curiae on behalf of the California Land Title Association, argues that accretions formed gradually and imperceptibly, whether caused naturally or artificially, belong to the upland owner, as against the state or its grantees. Respondent argues that the holding of the trial court that such areas formed by artificial accretions belong to the state, or its grantees, is amply supported by reason and authority.

At the threshold of this discussion we are met by the contention of amicus curiae that the federal and not the state cases govern the determination of this question. This contention is based on the admitted fact that appellant deraigns title from a United States patent confirming a prior Mexican grant. Starting from this premise, amicus curiae argues that the patent describes the seaward boundary as being the ordinary high tide line of the Pacific Ocean; that when the grantor is the United States and the grant is executed pursuant to an act of Congress, the question of the meaning and effect of the grant, that is, the question of the intent of Congress, is strictly a question of federal law, on which the decisions of the federal courts are controlling and binding regardless of what the state courts may have said upon the subject. The next step in the argument is the contention that when a federal grant of upland is bounded by navigable waters, accretions formed by the action of the waters by gradual and imperceptible degrees are included in the grant and belong to the upland owner, regardless of whether they have been caused or contributed to by artificial structures created by anyone other than the upland owner.

If it be assumed, for the moment, that the federal rule is as contended, the foundation for this argument is that appellant holds title through a federal grant—in other words, that the original grantor was the United States. █ Where ti-

tle is deraigned from the United States it is settled that the question as to the extent of the grant is to be governed by federal and not by state law. Thus in *Borax Consolidated* v. *City of Los Angeles,* 296 U.S. 10 [56 S.Ct. 23, 80 L.Ed. 9], the city brought an action to quiet its title to the alleged tidelands of Mormon Island in San Pedro Bay. The city asserted title under a legislative grant from the state similar to the one involved in the instant case. The defendant claimed under a patent issued by the United States to their predecessors in interest. The patent from United States was not simply a confirmation of a prior Mexican grant, but an outright grant by United States of public lands owned by it. The question as to the boundary of the patent turned upon the meaning of the phrase "mean high tide line." The Borax Company contended that the California courts had defined that phrase as the line of the "neap tides." The United States Supreme Court held that inasmuch as the Borax Company claimed under a federal grant the question as to the extent of that grant "is necessarily a federal question. It is a question which concerns the validity and effect of an act done by the United States; it involves the ascertainment of the essential basis of a right asserted under federal law." (296 U.S. at p. 22.) The court expressly refused to follow the California cases as to the meaning of the phrase "mean high tide line," held that such phrase did not mean the mean of the neap tides, but meant a mean of all high tides.

Under the authority of this case, if appellant claimed through a federal grant in the proper sense, there could be no doubt that the question involved would be governed by the federal and not the state law. But that rule only applies where title is derived from the United States. In the present case appellant did not deraign title from the United States at all. The title was predicated upon a Mexican grant. The issuance of the patent thereafter pursuant to an act of Congress was but confirmatory of the Mexican grant in performance of our government's obligations assumed under the Treaty of Guadalupe Hidalgo. The United States never had the true ownership of the property, and in no proper sense was it the grantor or the source of appellant's title. This exception to the rule announced in the Borax case, *supra,* is well settled. Thus in *Los Angeles Farming & M. Co.* v. *Los Angeles,* 217 U.S. 217 [30 S.Ct. 452, 54 L.Ed. 736], the Supreme Court of United States had under consideration a

proceeding to review a decision of the Supreme Court of this state. That decision had affirmed a judgment quieting the title of the city to the use of certain of the waters of the Los Angeles River. Both the city and the company claimed under patents issued by the United States, confirming certain Mexican grants. In the proceeding before the United States Supreme Court it was asserted that several federal questions were involved, including the claim that the California courts had interfered with the disposition of public lands by the United States. The Supreme Court dismissed the writ for want of jurisdiction. In doing so it discussed at length the question as to what law governs federal patents confirming Mexican grants, and held that the state and not federal law governs. Quoting from *Adam* v. *Norris,* 103 U.S. 591, 593 [26 L.Ed. 583], the court stated:

" 'But the United States, in dealing with parties claiming under Mexican grants, lands within the territory ceded by the treaty of Mexico, never made pretense that it was the owner of them. When, therefore, guided by the action of the tribunals established to pass upon the validity of these alleged grants, the government issued a patent, it was in the nature of a quitclaim,—an admission that the rightful ownership had never been in the United States, but had passed at the time of the cession to the claimant, or to those under whom he claimed. . . .'

"It is perhaps more accurate to say that the action of the United States in such cases is a confirmation rather than a quit claim." (217 U.S. at p. 227.)

Referring to the contention of the company that its rights were secured under the Treaty of Guadalupe Hidalgo and the federal statute passed pursuant thereto, the court, at page 227, stated: "The contentions as to the supposed rights derived under that treaty and act have been before this court in a number of cases, in which it has been uniformly held that rights alleged to have arisen thereunder, in the manner claimed by the present plaintiff in error, are not rights of Federal origin which, when denied, lay the basis for the review and reversal of the judgment of the state court." The court quoted at length from the decisions in *Townsend* v. *Greeley,* 5 Wall. (U.S.) 326 [18 L.Ed. 547] and *Hooker* v. *Los Angeles,* 188 U.S. 314 [23 S.Ct. 395, 47 L.Ed. 487], both holding that the extent of rights gained under confirmatory patents were to be determined by state law. In the Hooker case the precise

problem here under discussion was involved. In the Los Ange-les Farming & M. Co. case, at page 230, the court repeated with approval the following statement from the Hooker case. " 'Obviously, the question as to the title or right of plaintiffs in error in the land, and whatever appertained thereto, [the extent of certain water rights] was one of state law and of general public law, on which the decision of the state court was final.' " (See, also, *Devine* v. *Los Angeles*, 202 U.S. 313 [26 S.Ct. 652, 50 L.Ed. 1046]; *California Powder Works* v. *Davis*, 151 U.S. 389 [14 S.Ct. 350, 38 L.Ed. 206]; *Hardin* v. *Jordan,* 140 U.S. 371 [11 S.Ct. 808, 838, 35 L.Ed. 428].)

The United States Supreme Court in the Borax case, *supra,* the sole federal case relied upon to establish the rule con-tended for, did not purport to overrule or limit the well set-tled rule established by the above cases, and many more that could be cited, but in fact recognized this rule. California is in accord with these many cases. (*Teschemacher* v. *Thomp-son,* 18 Cal. 11, 22 [79 Am.Dec. 151].)

The only other case cited by amicus curiae on this point is *Bolsa Land Co.* v. *Vaqueros Major Oil Co.,* 25 Cal.App.2d 75 [76 P.2d 519]. That case involved a dispute between the owner of the upland on one side, and the state and its lessee on the other over the seaward boundary of the upland. That question turned upon the meaning of the phrase "ordinary high water mark." California has held that this phrase lim-its the boundary to the mean of the "neap tides," while the federal cases hold that the mean of all high tides must be in-cluded. At page 77 the court stated: "Wherever the lands are granted by the federal government, a federal question of course is involved, and the rule adopted by the Supreme Court of United States is controlling." Later the court cited and followed the rule of the Borax case, *supra,* (p. 80). The exact nature of the federal grant to the upland owner is not noted in the opinion. Counsel on both sides of the present controversy are agreed that the record shows that the upland owner deraigned title from a federal patent confirming a Mexican grant. The briefs in that case show that both coun-sel assumed that the rules applicable to federal grants, in the proper sense, were applicable. No one cited or discussed the rules established by the many cases above referred to. It is elementary, of course, that a decision which fails to consider a point of law cannot be considered as authority on that point.

(*Mortgage Guarantee Co.* v. *Chotiner*, 8 Cal.2d 110, 114 [64 P.2d 138, 108 A.L.R. 1080]; *Oakland Pav. Co.* v. *Whittell Realty Co.*, 185 Cal. 113, 119 [195 P. 1058]; *Hahn* v. *Kelly*, 34 Cal. 391, 404 [94 Am.Dec. 742].) Moreover, if there were a real conflict between the Bolsa Land Co. case and the Los Angeles Farming & M. Co. case, and the other federal cases cited, *supra*, on this subject, the federal cases would control. They determine that as to patents confirmatory of Mexican grants the state and not the federal law controls.

From what has been said it is quite obvious that the California decisions control the problem here presented as to whether accretions artificially caused belong to the upland owner or to the state. For this reason we do not find it necessary to decide what the federal rule may be on this subject. There are no doubt many federal cases, following the leading case of *County of St. Clair* v. *Lovingston*, 23 Wall. (90 U.S.) 46 [23 L.Ed. 59], relied upon by appellant, which hold that as between competing upland owners, or as between upland owners and others not claiming tidelands as successors of the state, artificial accretions belong to the upland owner. This is the general common law rule and probably the rule in this state. (*Forgeus* v. *County of Santa Cruz*, 24 Cal.App. 193 [140 P. 1092].) An entirely different rule may apply, however, where the upland owner attempts to assert title to lands formed by artificial accretions against the claim of the state, or its successor in interest, that such lands are tidelands. This distinction was clearly recognized in this state in the case of *Patton* v. *City of Los Angeles*, 169 Cal. 521 at page 525 [147 P. 141].) However, inasmuch as the California cases are decisive on the problem now before us, it is unnecessary to decide the interesting and confusing question as to what the federal or general common law rule on this subject may be.

■ When the California cases are considered there can be no reasonable doubt but that the rule in this state is that in a controversy between the state, or its grantees, and the upland owner, artificial accretions belong to the state, or its grantees, as the owner of the tidelands.

There is no statute in this state dealing with the doctrine of accretions in relation to tidelands. ■ Section 1014 of the Civil Code provides: "Where, from natural causes, land forms by imperceptible degrees upon the bank of a river or stream, navigable or not navigable, either by accumulation

of material or by the recession of the stream, such land belongs to the owner of the bank, subject to any existing right of way over the bank.'' The statute is limited by its very terms to accretions upon the "bank of a river or stream," and by statutory limitation only applies to accretions ''from natural causes.''

This statute codifies the California view of the common law of accretions upon rivers or streams. In *Strand Improvement Co.* v. *Long Beach,* 173 Cal. 765 [161 P. 975], it was held that the failure of the section to treat of alluvion forming upon the seashore did not warrant an inference that the common law rule of accretions had been to that extent abrogated in this state. The exact holding in this case was that the common law rule applied to the seashore just as it does by virtue of section 1014 of the Civil Code to the banks of rivers or streams. The court expressly refused to follow the federal case of *Western Pac. Ry. Co.* v. *Southern Pac. Co.,* 151 F. 376 [80 C.C.A. 606], which had held that section 1014 of the Civil Code by failing to mention accretions attached to the seashore, had to that extent, abrogated the common law rule.

So far as the opinion discloses, the accretions involved in the Strand Improvement Co. case, *supra,* were natural accretions, formed gradually and imperceptibly. The case stands for the proposition that the common law governs the ownership of accretions to the seashore, and that where such accretions occur naturally, they belong, in accordance with the common law rule, to the upland owner. It is true that Judge Shaw, the author of the opinion, does not use the word ''natural'' in discussing the rule, but the opinion indicates that the accretions there involved had been formed naturally. When the same author, some six months later, found it necessary to interpret his opinion in the Strand Improvement Co. case he clearly stated that the rule was limited to accretions from natural causes. In *Curtis* v. *Upton,* 175 Cal. 322, 334 [165 P. 935], Judge Shaw, speaking for a unanimous court, stated: ''The question of the effect of gradual accretions may become important with regard to the lines of surveys Nos. 10 and 34 bordering upon the sandspit. Recently, in *Strand. Improvement Co.* v. *Long Beach,* 173 Cal. 765 [161 P. 975] the court decided that the common law *that gradual accretions from natural causes* to land abutting upon water belong to the owner of the upland applied to lands fronting

upon tidal waters and to the shores of the ocean.'' (Italics added.)

Thus we start this phase of the discussion with the proposition that accretions to the seashore, formed gradually and imperceptibly by natural causes, belong to the upland owner. It is also admitted by all concerned that artificially filled tidelands, filled rapidly and not gradually and imperceptibly, belong to the state or its grantees and do not belong to the upland owner. ▮ The problem we are presented with falls between these two well-defined groups—who owns artificially filled or accreted tidelands, formed gradually and imperceptibly, as between the state, or its grantees, and the upland owner?

In every case where this problem has been considered where the state, or its grantees, were parties, it has been held that artificial accretions, forming gradually and imperceptibly, belong to the state, or its grantees, and do not belong to the owner of the upland. *Patton* v. *City of Los Angeles,* 169 Cal. 521 [147 P. 141] (also written by Judge Shaw) was an action to quiet title to a tract of land, a part of which was located within San Pedro Bay, containing about seven acres, and to enjoin the city from removing soil therefrom. The city claimed a portion of the area as owner of the tidelands as grantee of the state. The trial court quieted the plaintiff's title to the upland, but quieted the city's title to the tideland. On appeal the plaintiff urged that the land south of his boundary was not tideland but was in fact artificially accreted land, which accretions were caused by the erection of a railroad embankment from the upland across part of the bay, and contended that such artificial accretions belonged to him as upland owner. The court disposed of this contention in the following language (p. 525): ''Regarding this and other claims of accretions by and additions to the upland, or because of erections and embankments of others, it is sufficient to say that the point assumes that it was once tideland, and that this being so, it was reserved from sale, and was not alienable by any state officer under any law, during the time when the alleged accretions occurred, and, therefore, no artificial embankment, made by third persons, or made or suffered by state officers or agents, nor any accretion to the adjacent upland caused thereby, could operate to divest the state of its title to the tide land so reserved. . . . We can see no plaus-

ible reason for the contention that the making of such embankments, or accretions caused thereby, would operate in favor of third persons to divest the state of its title to tide lands covered by the embankment and accretions extending out over it from the adjacent upland, and transfer the title to the owner of the upland."

The court went on to discuss *Ledyard* v. *Ten Eyck*, 36 Barb. (N.Y.) 102, which holds that artificial accretions belong to the upland owner. It held that such case, and the rule there applied, has no application where the state is a party. At page 526 it is stated: "That was a controversy between the owner of the upland and the owner of other land in the vicinity. What the court decided was that the possession of the accretions by the owner of the abutting upland could be disputed by no one except the state." The court went on to hold that no title against the state could be acquired by adverse possession. Appellant contends that the case only involves deliberately filled tidelands. While it is true that some of the accretions involved were of this type, the language of the opinion above quoted demonstrates to a certainty that the court was not only concerned with the artificially constructed embankment, but also concerned with the accretions to the adjacent land "caused thereby." These last mentioned accretions are exactly of the type involved in the present action. The case directly stands for two propositions. (1) That reclaimed tidelands belong to the state or its grantees, and (2), that accretions to adjacent lands caused thereby belong to the state or its grantees.

Another important case on the subject is *City of Los Angeles* v. *Anderson*, 206 Cal. 662 [275 P. 789]. The decision in this case was based on two theories—either the accretions involved were not gradual, or if they were, they were artificial. In either event, says the court, they belong to the state, or its grantees. This action was brought by the city, the grantee from the state of the tidelands, to recover a small piece of land to which defendant claimed title by prescription. A 1908 survey demonstrated that at that time the questioned area was tideland. A breakwater was extended and completed in 1912. The area involved was between the old and new high tide line, and was based on the breakwater. At page 664 the court stated: "It is plaintiff's contention that this parcel of land, though resulting from accretions, was not of

such imperceptible formation as to constitute alluvion belonging to the owner of the upland, but was, in fact, created and formed by artificial means, namely, the deposit of foreign substances against the breakwater, and therefore retains its character as tideland, title to and possession of which remains in it as successor to and grantee of the state . . . subject only to certain trusts for the public use. On the other hand, the several defendants insistently urge that accretions occurring on the shore line of the ocean belong, under the authorities, to the owner of the abutting upland, thus precluding the plaintiff city—it having neither title to nor interest in the upland —from successfully prosecuting these several actions for possession of accretions thereto.'' The witnesses had testified that the high tide line remained as fixed in the 1908 survey until the breakwater was completed in 1912; that in the fall of 1912 a small accretion occurred at the root of the breakwater on the south; that the bluff caved in five or six hundred feet south of the breakwater and that some of that material lodged at the breakwater ''making a small fraction of an acre of accretion''; that this was increased by some material dumped over bluffs; that the accretion was created by the breakwater. After discussing the common law rule, and the Strand Improvement Co. case, *supra,* and after holding that the common law of accretion applies in this state, the court (p. 667) stated:

''In giving application to this rule, the authorities have consistently declared, in conformity with the common-law acceptation thereof, that, for the owner of the upland to be entitled to the accretions thereto, such accretions must have resulted from natural causes and been of gradual and imperceptible formation. . . . Where, however, the accretions have resulted, not from natural causes, but from artificial means, such as the erection of a structure below the line of ordinary high water, there is made out a case of purpresture, or encroachment, and the deposit of alluvion caused by such structure does not inure to the benefit of the littoral or upland owner, but the right to recover possession thereof is in the state or its successor in interest, as the case may be. . . .

''The formation of the triangular shaped piece of land here in controversy having resulted, as found by the trial court on abundant evidence, not from natural causes and by imperceptible degrees, but from the deposit and lodgment of for-

eign materials, as distinguished from the ordinary wash of the ocean, against the artificial obstruction offered by the government breakwater below the mean high-tide line, such parcel does not attach as alluvion to the ownership of the upland, but retains its character as public land, being in the nature of reclaimed or filled-in tide-land.''

The same rule was announced in *City of Newport Beach* v. *Fager,* 39 Cal.App.2d 23 [102 P.2d 438]. The factual situation was one where tidelands had been reclaimed. It was held, of course, that such tidelands belong to the state, or its grantees. After first holding that the upland owner has no legal right of free access to the water as against the state or its grantees where the state or its grantees put the tidelands to a lawful use (citing *Koyer* v. *Miner,* 172 Cal. 448 [156 P. 1023]; *Henry Dalton & Sons Co.* v. *Oakland,* 168 Cal. 463 [143 P. 721]; *City of Oakland* v. *Buteau,* 219 Cal. 745 [29 P.2d 177]; *People* v. *Southern Pacific R. R. Co.,* 169 Cal. 537 [147 P. 274]; *Boone* v. *Kingsbury,* 206 Cal. 148 [273 P. 797]; *San Francisco Sav. Union* v. *R. G. R. Petroleum Co.,* 144 Cal. 134 [77 P. 823, 103 Am.St.Rep. 72, 1 Ann.Cas. 182, 66 L.R.A. 242]), the court stated (p. 30): ''The fact that tide land is artificially raised above the line of mean high tide does not operate to divest the state of its title thereto nor does it change the character of such tide land.'' At page 31 it is stated:

''Defendants assert that the effect of the judgment was to deprive them of their property rights without due process and without compensation, contrary to constitutional guaranties. It must be borne in mind, however, that the littoral rights of an upland owner who does not own title to the submerged land or tide land in front of his property are, under the law in this state, subject to being terminated at will by any disposition which the state may choose to make of such submerged lands or tide lands [citing cases]. . . .

''In order for a littoral owner to be entitled to accretions which may form upon the upland, such accretions must have been the *result of natural causes and must have* been formed gradually and imperceptibly. . . . Accretions which have been added to the upland by artificial means do not inure to the benefit of the littoral owner but remain in the state or its successor in interest.'' (Italics ours.)

All of the more recent cases on the subject cite and rely upon the early case of *Dana* v. *Jackson Street Wharf Co.,* 31 Cal. 118 [89 Am.Dec. 164]. This was an action in ejectment

between two private parties. The plaintiff was the owner of an upland lot. Defendant erected a wharf adjoining the water lot of plaintiff. As a result by natural and artificial means a permanent accretion formed on the water lot of plaintiff. It was held that the state was the proper party to object. At page 120 it is stated: "As to the lands gained from the sea by alluvion, *i. e.* by the washing up of sand or earth, so as in time to make *terra firma*, the law is held to be that if this gain be by little and little, by small and imperceptible degrees, it shall go to the owner of the land adjoining. (2 Bl. Com. 61.) The findings, however, make a case of purpresture, or encroachment, by the erection of a wharf in a public harbor, and not a case of marine increase by alluvion, within the definition of that term as fixed by the foregoing citation."

Appellant and amicus curiae place considerable reliance upon the case of *Forgeus* v. *County of Santa Cruz*, 24 Cal. App. 193 [140 P. 1092]. That case merely determined that artificial accretions as between the upland owner and one not an upland owner belong to the upland owner. Neither the state nor its grantee was a party to the action. The facts were that plaintiff owned a tract of land abutting on Monterey Bay. Plaintiff's predecessors had granted the county an easement across this tract. A raised road was constructed thereon. The plaintiff fenced in the portion of the tract lying south and oceanward of the right of way. The county claimed this area was accreted land caused by the roadway, and belonged to it as owner of the right of way. The court held that if accretions were formed they were "due to the act of the county in raising the roadbed along said right of way. It could hardly be contended that the county by such artificial means could secure the fee to the alluvion as an addition to its right of way. The alluvion would be an accession to the fee and not to the easement." (p. 199.) The court then cites several out-of-state cases holding that artificial accretions, as between two private litigants, belong to the owner of the upland, if he did not create them. The court gave point to the distinction between such cases and cases where the state, or its grantees, claim such artificial accretions, stating (p. 200): "Clearly, there is a distinction between this case and that where a structure is erected, by the state or municipality, on land below the line of ordinary high water. In the latter case the deposit of alluvion caused by such structure would not

inure to .the benefit of the riparian owner,'' citing the Dana case, *supra*.

From these cases it must be accepted as settled in this state that accretions formed gradually and imperceptibly, but caused entirely by artificial means—that is, by the works of man, such as wharves, groins, piers, etc., and by the dumping of material into the ocean—belong to the state, or its grantee, and do not belong to the upland owner. In addition to the many reasons for this rule suggested in the opinions above referred to the following thought may be added. If accretions along an entire bay caused by the construction of a pier or wharf were held to belong to the upland owners as against the state, or its grantee, it would mean, in some cases, that the power of the municipality to improve its harbor would be cut off unless the accreted areas were condemned. It would mean that every time the state or its grantee determined to build a wharf or pier, or to grant a permit or franchise for such construction, it would be granting away a material portion of the tidelands along the entire bay that might later be covered by artificial accretions. Such a rule would mean that the state or its grantee could thus grant into private ownership tidelands which it holds under an irrevocable trust. Such rule would permit the state or its grantees thus indirectly to convey away these tidelands, held in trust, when it cannot do so directly. Such a rule would be violative of fundamental concepts of public policy.

It should be noted that we are not presented in this case with the problem as to what is the proper rule. where such accretions are the result of both natural and artificial causes. On that subject we express no opinion. The trial court has found that the entire area eroded by the building of the breakwater was created artificially by the means heretofore described. This area belonged to respondent. Appellant has suffered no legal damage to its lands by the erosion. The trial court correctly so held.

The judgment appealed from is affirmed.

Knight, J., and Ward, J., concurred.

A petition for a rehearing was denied May 17, 1944, and appellant's petition for a hearing by the Supreme Court was denied June 16, 1944. Curtis, J., Carter, J., and Schauer, J., voted for a hearing. Edmonds, J., did not participate therein. **Spence, J.,** acted pro tem.