BOROUGH OF WILDWOOD CREST, A MUNICIPAL CORPO-
RATION OF THE STATE OF NEW JERSEY, PLAINTIFF-
APPELLANT, v. CHARLES MASCIARELLA AND MAR-
GARET MASCIARELLA, HIS WIFE; RALPH JOHNSON
AND VERA JOHNSON, HIS WIFE; WILLIAM EARL
JOHNSON AND BERTHA JOHNSON, HIS WIFE; ROBERT
E. KAY AND ADALENE W. KAY, HIS WIFE; VELMA M.
DARE, DEFENDANTS - RESPONDENTS, AND DEPART-
MENT OF CONSERVATION AND ECONOMIC DEVELOP-
MENT OF THE STATE OF NEW JERSEY AND THE
STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued December 4, 1967—Decided March 18, 1968.

*Mr. Stephen L. Skillman,* Deputy Attorney General, argued the cause for defendants-appellants (*Mr. Arthur J. Sills,* Attorney General of New Jersey, attorney; *Mr. Richard Newman,* Deputy Attorney General, of counsel).

*Mr. Morton I. Greenberg* argued the cause for plaintiff-appellant.

*Mr. Nathan C. Staller* argued the cause for defendants-respondents; *Mr. Robert E. Kay,* attorney *pro se.*

The opinion of the court was delivered by

JACOBS, J. A declaratory judgment was entered in the Chancery Division pursuant to its opinion in *Wildwood Crest v. Masciarella,* 92 *N. J. Super.* 53 (1966). Appeals by the plaintiff-appellant and the defendants-appellants to the Appellate Division were certified by us before argument there. *R. R.* 1:10–1.

The facts were stipulated and were sufficiently set forth below. In 1905 the Wildwood Crest Company became the upland owner of land bordering on the Atlantic Ocean. In 1915 it bought and received a riparian grant from the Board of Commerce and Navigation. The grant conveyed the submerged land adjacent to the upland for a distance of 1,000 feet from the high water mark to the exterior line established by the Riparian Commissioners under their statutory authority and as shown on an attached map. The grant provided that the State of New Jersey, by its Board of Commerce and Navigation, could change the exterior line and fix it further from the shore, in which case the holder of the grant would have the exclusive right to apply for and receive a grant of the additional submerged land between the present exterior line and the new exterior line.

█ Since the making of the grant in 1915, all of the submerged land from the high water mark to the exterior line and for about 200 feet beyond has become fast and

visible land. This was not the result of any filling in or other action by the upland owner but was the result of accretion. The stipulation set forth that the area "has gradually and imperceptibly accreted" during the years from the riparian grant to the present time. There was some evidence that the accretion was stimulated by the Government's construction of jetties in 1911 at Cold Spring Harbor, about three miles away, and by the Government's closing in 1917 of Turtle Gut Inlet, to the south of Wildwood Crest. But the trial judge found that this evidence did not call for the conclusion that the accretion was caused by artificial means and that, at best, it must be concluded that "the accretion was caused by a combination of natural and artificial causes." 92 *N. J. Super.,* at *p.* 63. This finding is clearly supported by testimony in the record.

Through mesne conveyances the area has become vested in the individual defendants, the Masciarellas, the Johnsons and the Kays, who are now the upland owners. The action insofar as the individual defendant Dare is concerned has been dismissed and is not before us on appeal. 92 *N. J. Super.,* at *p.* 56. The upland owners contend that they are entitled to all the land which has accreted including the 200 feet beyond the original exterior line, and they further contend that the exterior line in the grant was ambulatory and now extends for 1,000 feet beyond the present high water mark. The State contends that the exterior line in the grant was not ambulatory but was firmly fixed in 1915 and that the 200 feet of accreted land beyond that line is now owned by the State. In support of its position it asserts (1) that the grant intended not only to vest in the upland owner the area described therein but also to restrict the grantee to that area, thereby depriving it of any claim to accreted land beyond the exterior line and (2) that even if that be unsound the 200 feet here in question should be deemed the property of the State, rather than the upland owners, on the ground that it was the result of artificial rather than natural causes.

· ▇ The Borough of Wildwood Crest supports the State's position except that it claims that title to the accreted 200 feet is in it rather than the State by virtue of *L.* 1942, *c.* 345. The Chancery Division held that the upland owners were entitled to the benefit of the accretion and therefore found no occasion to determine the issue between the State and the Borough. 92 *N.J. Super.,* at *p.* 64. In this connection we are entirely satisfied that *L.* 1942, *c.* 345 does not grant to the Borough any ownership of the land in question as against the claim of the State. As its title and terms clearly indicate, the cited statute was simply designed to fix the boundaries of the Borough for jurisdictional purposes (*cf. Ross v. Mayor, &c., Edgewater,* 115 *N. J. L.* 477, 486 (*Sup. Ct.* 1935), affirmed, 116 *N. J. L.* 447 (*E. & A.*), cert. denied, 299 *U. S.* 543, 81 *L. Ed.* 400 (1936)) and was not at all designed to transfer any of the State's interest in its submerged lands. See 2 *McQuillin, Municipal Corporations* § 7.06, *p.* 295 (*3d ed.* 1966); *cf. Henderson v. Atlantic City,* 64 *N. J. Eq.* 583 (*Ch.* 1903); *R. S.* 12:3–33 *et seq.* .

▇ New Jersey's law of accretion, rather than the federal decisions, is admittedly controlling here. See 43 *U. S. C. A.* § 1301 *et seq.;* 1 *Shalowitz, Shore and Sea Boundaries* 115 *et seq.* (1962); *cf. Hughes v. Washington,* 389 *U. S.* 290, 88 *S. Ct.* 438, 19 *L. Ed. 2d* 530 (1967). That law has been extensively set forth below (92 *N. J. Super.,* at *p.* 57) as well as in earlier opinions by our courts. See *Stevens v. Paterson and Newark R. R. Co.,* 34 *N. J. L.* 532 (*E. & A.* 1870); *Ocean City Association v. Shriver,* 64 *N. J. L.* 550 (*E. & A.* 1900); *Bailey v. Driscoll,* 34 *N. J. Super.* 228, 246 (*App. Div.*), reversed, 19 *N. J.* 363 (1955); *Schultz v. Wilson,* 44 *N. J. Super.* 591, 596 (*App. Div.*), certification denied, 24 *N. J.* 546 (1957); *River Development Corp. v. Liberty Corp.,* 45 *N. J. Super.* 445, 453 (*Ch. Div.* 1957), affirmed, 51 *N. J. Super.* 447 (*App. Div.* 1958), affirmed, 29 *N. J.* 239 (1959). See also 1 *Waters and Water Rights* § 40, *p.* 245 *et seq.* (*R. Clark ed.* 1967).

· ▉ Private title to lands along the Atlantic Ocean, as well as other tide-flowed lands, extends to the high water mark. Beyond that, title is in the State and is subject to legislative disposition within constitutional limits. The high water mark may shift from time to time through erosion and accretion and persons who own or purchase tide-flowed lands are well aware of this. Where there is erosion, they lose title to the State; where there is accretion, they gain title at the expense of the State. The doctrine of acquisition by accretion is said to have been founded on a principle of compensation; in *Ocean City Association v. Shriver, supra,* Chief Justice Depue put the matter in the following terms:·

The proprietor of lands having a boundary on the sea is obliged to accept the alteration of his boundary by the changes to which the shore is subject. He is subject to loss by the same means that may add to his territory; and, as he is without remedy for his loss, so he is entitled to the gain which may arise from alluvial formations. This rule is vindicated on the principle of natural justice, that he who sustains the burden of losses imposed by the contiguity of waters ought to receive whatever benefits they may bring by accretion. Banks v. Ogden, 2 Id., 57; 1 *Am. & Eng. Encycl. L.* (2d ed) 476, *note* 1. 64 *N. J. L.,* at *p.* 555.

Although unnecessary to its decision, the lower court stated that the rule of accretion could be supported as preserving the upland owner's "right of access to the sea." 92 *N. J. Super.,* at *p.* 58. The existence of a valuable property right of access, as such, has been recognized elsewhere though not in New Jersey. See 1 *Waters and Water Rights, supra,* § 38, *p.* 221, § 43, *p.* 273; 2 *Tiffany, Real Property* § 665, *p.* 714 *(3d ed.* 1939) ; 2 *Walsh, Commentaries on the Law of Real Property* § 227, *p.* 536 (1947) ; 3 *American Law of Property* § 12.32, *pp.* 266–67 (1952). While the *Tiffany* and *Waters and Water Rights* treatises collect many cases in support of the stated right they also cite, as *contra,* the decision of the Court of Errors and Appeals in *Stevens v. Paterson and Newark R. R. Co., supra,* 34 *N. J. L.,* at *p.* 550. See also *Bailey v. Driscoll, supra,* 34 *N. J. Super.,* at *pp.* 247–

48; *River Development Corp. v. Liberty Corp., supra,* 51 *N. J. Super.,* at *p.* 464; *cf. Leonard v. State Highway Dept. of N. J.,* 29 *N. J. Super.* 188 (*App. Div.* 1954); *Ward Sand and Materials Co. v. Palmer,* 51 *N. J.* 51 (1968).

In *Stevens,* Chief Justice Beasley held that, apart from alluvion and dereliction, the upland owner's legal interest in the sea is no different than that of the public generally. He took the position that the Legislature had full dominion over the sea and the submerged land and could not only regulate or vacate the public rights therein but could also authorize, without compensation, the laying of roads in front of the riparian uplands, thereby barring the access of their owners. 34 *N. J. L.,* at *pp.* 552–53. In *Bailey v. Driscoll, supra,* Justice Hall, while a member of the Appellate Division, accepted the authority of *Stevens* but pointed out that, in an earlier case, the same Chief Justice had taken note of the sentiment which he said had given recognition to "a natural equity, so to speak, in the riparian owner to preserve and improve the connection of his property with the navigable water". 34 *N. J. Super.,* at *p.* 248; *Keyport Steamboat Co. v. Farmers Transportation Co.,* 18 *N. J. Eq.* 511, 516 (*E. & A.* 1866). This of course is not the case in which to pursue inquiry as to whether *Stevens* operates fairly and should be fully embraced for modern times since that was not an issue below nor is it an issue before us. *Cf. O'Neill v. State Hwy. Dept.,* 50 *N. J.* 307, 322 (1967). The sole purpose of our present reference to the subject is to avoid any implication that we have passed on the lower court's expressions with respect to the right of access to the sea. 92 *N. J. Super.,* at *pp.* 58, 61, 63. See *United States v. Rands,* 389 *U. S.* 121, 88 *S. Ct.* 265, 19 *L. Ed. 2d* 329 (1967); *United States v. Virginia E. & P. Co.,* 365 *U. S.* 624, 81 *S. Ct.* 784, 5 *L. Ed. 2d* 838 (1961); *United States v. Twin City Power Co.,* 350 *U. S.* 222, 76 *S. Ct.* 259, 100 *L. Ed.* 240 (1956); *Port of Seattle v. Oregon & Washington R. Co.,* 255 *U. S.* 56, 41 *S. Ct.* 237, 65 *L. Ed.* 500 (1921); *cf. United States v. 50 Foot Right of Way*

*in Bayonne, N. J.,* 337 *F.* 2d 956, 960 (3 *Cir.* 1964); *Thomas v. Commonwealth,* 412 *S. W.* 2d 578 (*Ct. App. Ky.* 1967); 26 *Am. Jur.* 2d *Eminent Domain* § 193, *p.* 873 (1966).

 The trial judge rejected the suggestion that because artificial structures may have contributed to the accretion it should be deemed the property of the State. He held in major effect that, at least here, where the accretion was not the result of any action on the part of the upland owners (92 *N. J. Super.,* at *p.* 58; *Seacoast, &c., Co. v. American Timber Co.,* 92 *N. J. Eq.* 219, 221 (*E. & A.* 1920)) nor the result of any project by the State in aid of navigation (or other public project unrelated to shore protection), the alluvion was the property of the upland owners. 92 *N. J. Super.,* at *p.* 62; *Michaelson v. Silver Beach Improvement Ass'n, Inc.,* 342 *Mass.* 251, 173 *N. E.* 2d 273, 277, 91 *A. L. R.* 2d 846 (1961). We agree entirely with this holding and for present purposes need go no further, while pointing out that the judicial decisions elsewhere assert very broadly that gradual and imperceptible accretions belong to the upland owners though they may have been induced by artificial structures. See, *e.g., St. Clair Co. v. Lovingston,* 23 *Wall* 46, 90 *U. S.* 46, 66, 23 *L. Ed.* 59, 63 (1874); *State v. Sause,* 217 *Or.* 52, 342 *P.* 2d 803, 820 (1959); Annot., *Waters: rights in respect of changes by accretion or reliction due to artificial conditions,* 134 *A. L. R.* 467 (1941). See also 92 *N. J. Super.,* at *p.* 60. In *St. Clair, supra,* the Supreme Court set forth in the following terms what *Shalowitz* (*supra* at *p.* 102) describes as the "federal rule":

In the light of the authorities, alluvion may be defined as an addition to riparian land, gradually and imperceptibly made by the water to which the land is contiguous. It is different from reliction, and is the opposite of avulsion. The test as to what is gradual and imperceptible in the sense of the rule is, that though the witnesses may see from time to time that progress has been made, they could not perceive it while the process was going on. Whether it

is the effect of natural or artificial causes makes no difference. The result as to the ownership in either case is the same. 23 Wall at 68, 90 *U. S.*, at 68, 23 *L. Ed.*, at *p.* 64.

The rule as thus framed has been adhered to in most of the states. 92 *N. J. Super.;* at *p.* 60. The annotation in 134 *A. L. R.* 467, *supra,* collects earlier cases and some more recent decisions may be found in *State v. Sause, supra,* 342 *P. 2d,* at *pp.* 820–21. The California cases upon which the State relies have taken a somewhat different course (1 *Shalowitz, supra,* at *p.* 103), but they contain little on which to base any questioning of the trial judge's holding here. 92 *N. J. Super.,* at *pp.* 62–63. In *City of Los Angeles v. Anderson,* 206 *Cal.* 662, 275 *P.* 789, 791 (1929) the alluvion was found to have resulted "not from natural causes and by imperceptible degrees" but from the deposit and lodgment of foreign materials against a breakwater which had been erected by the federal government. The California Supreme Court held that it belonged to the state's grantee rather than to the upland owner. In *Carpenter v. City of Santa Monica,* 63 *Cal. App.* 2d 772, 147 *P.* 2d 964 (1944) the California District Court of Appeals voiced the view that where accretions are caused "entirely by artificial means" the alluvion is the property of the state rather than the upland owner; but it expressly reserved decision as to what the proper rule is where, as here, the accretion is the result of "both natural and artificial causes." 147 *P.* 2d, at *p.* 975. In *Abbot Kinney Co. v. City of Los Angeles,* 340 *P.* 2d 14 (1959), *vacated on other grounds,* 53 *Cal.* 2d 52, 346 *P.* 2d 385 (1959), the California District Court of Appeals seems to have taken the position that gradual and imperceptible accretion resulting from "both natural and artificial processes" belongs to the upland owner and not the public. 340 *P.* 2d, at *p.* 19. Obviously the California cases are much too slender a reed on which to ground the thought of departing from any generally prevailing principles in this ancient field of prop-

erty law. See O'Neill v. State Hwy. Dept., supra, 50 N. J., at p. 322.

█ We come now to the final question, namely, the effect of the 1915 riparian grant. 92 N. J. Super., at p. 64. The grant was properly made pursuant to L. 1871, c. 256 (R. S. 12:3–10); Bailey v. Driscoll, supra, 19 N. J., at p. 371. It described the exterior line which had been established "with due regard to the interests of navigation" (R. S. 12:3–10) and it expressly provided that the State could change the exterior line and fix it further from the shore, in which event the holder of the grant would "have the exclusive right to apply for and receive a lease or grant of the additional land under water lying between the present exterior lines above described and the new exterior line or lines that may hereafter be fixed." In the light of the terms and purposes of the grant, it is entirely clear to us that the exterior line was not ambulatory as the upland owners contend but was firmly fixed in 1915 as the State contends. See 92 N. J. Super., at p. 64; Mayor etc. of Hoboken v. Pennsylvania R. R. Co., 124 U. S. 656, 688–689, 8 S. Ct. 643, 31 L. Ed. 543, 551 (1888).

█ Though the exterior line was fixed rather than ambulatory, it does not at all follow that the State is entitled to the 200 feet of alluvion which has accumulated beyond that line. The riparian grant was intended to convey to the upland owner title and rights which the upland owner did not then have. Nowhere in the grant was there any intimation whatever of an intent to forego or limit rights it already had. One of those rights was to alluvion which might thereafter gradually and imperceptibly attach to the upland. Here the upland owners clearly established their rights to the alluvion independently of the grant and the State may not now fairly seek to turn the grant to their disadvantage. We approve the lower court's disposition of the matter (92 N. J. Super., at p. 64) and its judgment is:

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, GOLDMANN and SCHETTINO—6.

*For reversal* — None.